702 So.2d 213 (1997)
Bobbie Lee ROBINSON, Appellant,
v.
STATE of Florida, Appellee.
No. 79604.
Supreme Court of Florida.
November 13, 1997.
*214 Paul A. McKenna and Curt Obront of McKenna & Obront, Coconut Grove, for Appellant.
Robert A. Butterworth, Attorney General and Fariba N. Komeily, Assistant Attorney General, Miami, for Appellee.
PER CURIAM.
Bobbie Lee Robinson appeals his convictions and sentences for first-degree murder and two counts of attempted first-degree murder, including his sentence of death for the first-degree murder. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
This is an extremely unusual case. It involves the administrative removal of the trial judge as a result of a criminal investigation after the penalty phase but before sentencing, a questionable relationship between the trial judge and the attorney appointed by him to represent Robinson, and the improper conduct of that attorney. As explained below, we conclude that, to maintain the integrity and credibility of the judicial process, a new trial should have been granted.
The record reflects that Lee Arthur Lawrence, Sr., was murdered in the parking lot of his grocery store in southern Dade County on March 20, 1989. The victim had been an activist in the war against drugs in his neighborhood. Four suspects were charged in the crime. Bobbie Lee Robinson, the appellant in this case, was the alleged instigator of this asserted contract murder but was not an actual participant at the scene. Robinson was convicted of first-degree murder and two counts of attempted first-degree murder. He was sentenced to death for the firstdegree murder conviction and to consecutive sentences of thirty years in prison for the two attempted first-degree murder convictions. With regard to the participants at the scene, Ronnie Johnson, one of the shooters, was convicted of first-degree murder, attempted first-degree murder, and aggravated assault, and was sentenced to death for the first-degree murder conviction. Johnson's convictions and sentences were affirmed by this Court in Johnson v. State, 696 So.2d 317 (Fla.1997). David Ingraham, the other shooter, was convicted of first-degree murder and sentenced to life in prison. Ingraham's conviction and sentence were affirmed on appeal. Ingraham v. State, 626 So.2d 1117 (Fla. 3d DCA 1993). Rodney Newsome was convicted of second-degree murder and sentenced to twenty-two years in prison. Newsome's conviction and sentence were also affirmed on appeal. Newsome v. State, 625 So.2d 143 (Fla. 3d DCA 1993).
The first of the unusual circumstances of this case concerns the trial judge's administrative removal after the jury portion of the penalty phase. The second relates to Robinson's counsel, a former law partner of the trial judge, who was appointed by the trial judge as a special assistant public defender in this case. This attorney was ultimately disciplined by The Florida Bar for the manner in which he conducted the defense of this case.

The Judge
Robinson's case was assigned to Dade County Circuit Judge Alfonso Sepe. The trial *215 began on April 2, 1991; the guilt phase concluded on April 17; and the penalty phase before the jury concluded on April 18. While Robinson's sentencing was pending, the United States Attorney's office concluded an investigation into corruption in the Dade County Circuit Court entitled "Operation Court Broom." On June 8, 1991, a search warrant was executed at Judge Sepe's office and home, and evidence of possible corruption was seized.[1] A detailed account of Operation Court Broom and the resulting indictments and trials, including the trial of Judge Sepe, is contained in the opinion in United States v. Shenberg, 89 F.3d 1461 (11th Cir.1996), cert. denied sub nom. Sepe v. United States, ___ U.S. ___, 117 S.Ct. 961, 136 L.Ed.2d 847 (1997). The Judicial Qualifications Commission learned of the federal investigation in June of 1991. Judge Sepe took a voluntary leave from office with compensation and as a result was administratively removed from the Robinson case. On October 15, 1991, the Supreme Court of Florida suspended Judge Sepe without compensation. In re Shenberg, 632 So.2d 42 (Fla.1992).
On May 27, 1992, a federal grand jury in the Southern District of Florida returned a thirty-two count indictment against Sepe, charging him with conspiracy to violate the Racketeer Influenced and Corrupt Organizations statutes (RICO), substantive RICO violations, conspiracy to commit extortion, attempted extortion, mail fraud, and money laundering. The government specifically alleged that Sepe accepted bribery payments for fixing cases and kickbacks for appointing private attorneys to serve as special assistant public defenders. Following a six-month trial and six-week jury deliberation, Sepe was found not guilty on twenty-seven counts, but the jury was unable to reach a verdict on five counts concerning RICO violations and extortion. After appeals, the case has now been remanded for retrial on those counts.

The Lawyer
Alan Soven was appointed by Judge Sepe to serve as Robinson's special assistant public defender as a result of a conflict in the public defender's office arising from the need of the multiple defendants for representation. Judge Sepe and Soven had been partners in a private practice law firm before Judge Sepe became a circuit court judge. After Judge Sepe ascended to the bench, the two men remained friends and their families socialized.
On Robinson's request, Soven filed a demand for speedy trial. However, the record suggests that Soven had not diligently investigated the case and was not prepared for trial. At the time of the demand, Soven had not filed a witness list and had not taken the depositions of any witnesses needed to corroborate the defense theory. In addition, after the trial began, Soven asked the court to authorize an expenditure of $5000 to employ a private investigator to look for possible defense witnesses. The court authorized the expenditure of $500 instead.
At trial, Soven's opening statement was dedicated to the theory that the victim's son, Lee Arthur Lawrence, Jr., rather than Robinson, hired three men to kill his father. Soven argued in his opening statement that the younger Lawrence was motivated to kill his father for three reasons: to prevent his father from interfering with his drug trade; to inherit ownership of the grocery store; and to benefit from the proceeds of his father's life insurance policy. Soven also told the jury that on the day of the murder, the victim and his son had a spirited physical fight. During the course of the trial, Soven failed to present any evidence to support his opening statement. In his closing argument, Soven explained this failure as follows:
In the opening statement in the beginning of this trial, I did two things. I shocked you and I told you to stay focused. I shocked you when I told you that Lee Arthur Lawrence, Jr. murdered his father or that he had his father executed, and I told you to stay focused. Why did I do that?
....

*216 So I told you that Lee Arthur Lawrence, Jr. executed his father. And it shocked you and it got your attention. It got you to sit on the edge of your chair and it got you to open your mind. But, most importantly, it got you to question the State's case, and you did that.
We note that subsequent to the trial court's proceeding, and while this matter was pending on appeal, Soven was disciplined by The Florida Bar for his conduct in this trial relating to his opening and closing arguments. Florida Bar v. Soven, Fla. Bar File No. 91-71,236(11J)(1991)(admonishing Soven for knowingly presenting fictitious arguments to the jury).
On April 17, 1991, the jury found Robinson guilty. On the next day, the evidentiary portion of the penalty phase before the jury was held. Soven called Robinson's parents to testify as to mitigating circumstances. Willie Robinson testified that appellant was a nice child. His mother testified that appellant was emotionally troubled by the murder of his brother in 1987. Soven presented no further evidence in mitigation. The following day, the jury rendered an advisory sentence of death by a vote of ten to two.

Proceedings after Assignment of New Judge and Appointment of New Lawyer
As noted previously, in June of 1991, Sepe was administratively removed from the case. On September 4, 1991, Robinson expressed to the successor judge his dissatisfaction with Soven's representation, and Soven withdrew as counsel. New counsel appointed to represent Robinson sought a new trial and an opportunity to present additional evidence in mitigation to the judge.
Robinson's motion for a new trial alleged that his right to a fair and impartial trial was violated because of the actions of his counsel and the trial judge. In support of this motion, the appellant's wife, Valerie Robinson, testified as follows:
Q [Defense Counsel]: What conversations did you have with Alan Soven regarding money?
A: Alan approached me and said that he needed ten grand, and Bobbie would walk free.
Q: When did he tell you that?
A: Before the trial, and during the trial.
Q: How many times did he tell you that?
A: Well, he told me twice about the ten grand on certain times. He asked me for the money. He asked me for the money.
Q: What was the reason he needed the money?
A: Well, he said so Bobbie could walk, and him and Sepe to have dinner together.
Q: Did you ever learn whether or not Mr. Soven and Judge Sepe had had any prior relationship?
A: No. I didn't know before that when he said it.
Q: Who is the first person that told you about the relationship between Mr. Soven and Judge Sepe?
A: Soven.
Q: At any time, did you give money to
Mr. Soven?
A: Yes.
Q: How many times?
A: It was twice, but I can'tI don't remember one time.
Q: How much money did you give him each time?
A: A thousand dollars.
....
Q [Prosecutor]: Now, did Mr. Soven indicate to you how this ten thousand dollars was going to get Bobbie, how he would get Bobbie to walk?
A: He said not to worry, that him and Sepe had dinner on occasions.
Q: He gave no more specifics how he was going to make this work?
A: He didn't have to. That right there should tell you.
....
Q [The Court]: One question. Did Mr. Soven ever tell you that the money that you were giving him was going to go to Judge Sepe, any of the money?

*217 A: Yeah. He said he needed ten grand, and that me and Sepe was Okay. We would have dinner together, and he guaranteed Bobbie would walk.
Willie Robinson, appellant's father, then testified that Valerie Robinson provided him with $1000, which he delivered to Soven. Willie Robinson also testified that Soven twice asked him for money so he could do a better job defending his son. Soven admitted receiving $1000 from Willie Robinson, but denied receiving any money from Valerie Robinson. Soven's receipt of ten one-hundred-dollar bills in a white envelope was confirmed by a lawyer associate in Soven's office. Soven explained that the money he received was an unsolicited gift. The record reflects that Dade County paid Soven $15,482 for his services in this case. Soven neither reported the receipt of the money to the court nor offset the compensation he received from the county by this amount. Soven denied requesting money from either Robinson's wife or his father.
The substitute judge granted new counsel's request to be allowed to present additional evidence in mitigation not presented to the jury.[2] Valerie Robinson testified that her husband was kind to her and a good father. She also stated that her husband abused drugs and alcohol, especially since his brother's murder. Expert testimony was also offered to show Robinson's borderline intelligence, paranoia, and impaired judgment.
The substitute judge reviewed and read the entire record in this case, denied the motion for new trial, and imposed a death sentence. The following four statutory aggravating factors were found to be present: (1) Robinson had prior violent felonies; (2) Robinson knowingly created a great risk of death to many persons; (3) the murder was committed for pecuniary gain; and (4) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The substitute judge found no statutory mitigating circumstances, but did find some nonstatutory mitigation. He concluded, however, that the mitigation was utterly overwhelmed by the aggravating factors.
Robinson argues that his motion for a new trial should have been granted on the grounds that he did not receive a fair trial based on the circumstances of this trial. We must agree. We find that, under the circumstances of this case, the credibility and integrity of the judicial process require a new trial. We cannot ignore the facts set forth in the reported judicial opinion that reveals that the indicted incidents of bribery involving Judge Sepe occurred during the time Robinson's trial was ongoing. United States v. Shenberg, 89 F.3d 1461 (11th Cir.1996). Nor can we ignore the fact that Soven was disciplined by an arm of this Court for his conduct in this trial. Soven failed to adequately prepare for trial, lied to the jury, put on almost no evidence in mitigation, and accepted money from Robinson's family even though he was bound to represent Robinson without charge to him or his family. While any one of these circumstances taken alone might be insufficient to warrant a new trial or be considered harmless error, when considering these factors combined we cannot conclude that Robinson received a fair and impartial trial. Accordingly, we reverse the convictions and sentences, including the death sentence, and remand this case for a new trial. In doing so, we in no way criticize the successor trial judge in this case. He did not bring about the circumstances that require this new trial.
It is so ordered.
KOGAN, C.J., and SHAW, GRIMES, HARDING and ANSTEAD, JJ., concur.
OVERTON, J., concurs with an opinion in which WELLS, J., concurs.
WELLS, J., concurs with an opinion in which OVERTON, J., concurs.
*218 OVERTON, Justice, concurring.
I strongly recommend a change in how the appointment of conflict counsel should occur when the public defender's office is unable to represent a defendant. In my view, the appointment of individual lawyers as special assistant public defenders in conflict cases is problematic. Special assistant public defender appointments can result in multiple levels of competency among the attorneys available to represent indigent defendants. In addition, the cost of paying these attorneys is borne entirely by the counties and is one of the article V costs that local governments are required to pay. Finally, special assistant public defender appointments can serve as a means of political patronage.
There is a relatively simple solution to the problems I have outlined. First, each public defender's office should be mandated to have a conflict section in which the lawyers in that section do nothing but represent defendants in adjacent circuits in conflict cases. Second, the legislature needs to fund the public defenders to carry out this responsibility and relieve local government of this expense. Third, to avoid unnecessary travel expenses by conflict sections, counties should provide separate office facilities for those conflict offices that have a full case load of conflict cases in these counties. For example, Broward County should provide office space for Eleventh Circuit public defenders who are trying Seventeenth Circuit cases and Dade County should provide office space for Seventeenth Circuit public defenders who are trying Eleventh Circuit cases.
It is my hope that the legislature will address these problems in its next legislative session.
WELLS, J., concurs.
WELLS, Justice, concurring.
I concur in the result of this case because it is required for the reasons stated by the majority.
I write for two reasons. First, I fully agree with the concurring opinion by Justice Overton in pointing to the severe problem of conflict counsel. This problem should be addressed by the next session of the legislature. The solution proposed by Justice Overton clearly is reasonable and would alleviate many problems which recur in the circuit courts throughout the state and have an adverse financial impact on every county.
Second, I write to highlight the totally unreasonable length of time that this case has taken on appeal, resulting in the new trial not being able to be held until what will be nine years since the crime. I note that the sentencing order is dated February 11, 1992, and the notice of appeal was filed on March 30, 1992. However, appellant's brief was not filed until June 17, 1996. Regardless of the reasons for this four-year delay, there can be no valid excuse for it and no tolerance of it.
This brings me to the second reform which should be considered by the legislature. The public defender's office (under Justice Overton's proposal it will always be a public defender's office) that has the trial responsibility for the case should be required to have the appellate responsibility. This would have the positive effect of being able to pinpoint responsibility for getting appeals timely pursued. It would have the additional positive effect of having the trial lawyer and the appellate lawyer in the same office. My experience has taught me that no one knows a trial record better than the trial lawyer, and no one knows what points should be appealed better than the trial lawyer.
OVERTON, J., concurs.
NOTES
[1] Search warrants were also executed at the offices and homes of Judges Roy Gelber, Harvey Shenberg, and Phillip Davis. Judge Gelber subsequently agreed to cooperate with the government's investigation and testify against the codefendants.
[2] Our decision to remand Robinson's case for a new trial is not based on Corbett v. State, 602 So.2d 1240 (Fla.1992), which was decided after the motion for new trial was filed in this case. In that case we concluded that where there was a proper objection that a substituted sentencing judge did not hear the evidence presented to the jury during the penalty phase of the trial, a new sentencing proceeding must be conducted before a new jury to ensure that both the judge and jury hear the same evidence that will be determinative of whether a defendant lives or dies.