784 So.2d 418 (2001)
Marshall Lee GORE, Appellant,
v.
STATE of Florida, Appellee.
No. SC96127.
Supreme Court of Florida.
April 19, 2001.
*423 William M. Norris, Coconut Grove, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Sandra S. Jaggard, Assistant Attorney General, Miami, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Marshall Lee Gore. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the convictions for first-degree murder and armed robbery and the sentences, including the sentence of death.

BACKGROUND
This appeal arises from the retrial of Gore as ordered by this Court in Gore v. State, 719 So.2d 1197, 1203 (Fla.1998). Gore was initially tried, convicted of first-degree murder, and sentenced to death in 1995 for the killing of Robyn Novick.[1] On appeal, this Court reversed the judgment and sentence and ordered a new trial due to the cumulative effect of the State's improper cross-examination of Gore and improper closing argument. See id. at 1197. Gore was retried and again convicted and sentenced to death.
The record of Gore's retrial reflects the following facts. Police discovered Novick's nude body in a rural area of Dade County on March 16, 1988. Her body was hidden by a blue tarpaulin-like material. Novick suffered stab wounds to the chest and had a belt tied around her neck. According to the medical examiner, Novick died as a result of the stab wounds and mechanical asphyxia. He estimated that Novick was killed between 9 p.m. and 1 a.m. on March 11 into March 12, 1988.
Novick was last seen alive on March 11, 1988, leaving the parking lot of the Redlands Tavern in her yellow Corvette. A witness testified that Novick left with a man, whom the witness identified as Gore.
In the early morning of March 12, Gore was seen driving Novick's automobile. David Restrepo, a friend of Gore's, testified that Gore arrived at his home driving a yellow Corvette with a license plate reading "Robyn." Restrepo had not seen the car before and stated that when he last saw Gore in February 1988, Gore was driving a black Mustang. Gore told Restrepo that his girlfriend had loaned him the Corvette and asked Restrepo to call him "Robyn." Gore also asked Restrepo to accompany him to Coconut Grove.
On the way to Coconut Grove, Gore lost control of the vehicle and "wrecked" the Corvette. Gore attempted to drive the vehicle away from the scene of the accident, but abandoned the vehicle a few *424 blocks away. Restrepo testified that shortly after the accident a marked police vehicle was coming towards them, at which time, Gore told him to "run" because the car was stolen. Gore also told Restrepo that he had left jewelry in the car. When the police arrived on the scene, they recovered credit cards, a driver's license and a cigarette case, all belonging to Novick, as well as a "power of attorney" executed by Gore.
Jessie Casanova, who was thirteen years old at the time of Novick's murder, testified that Gore came to her home in the early morning hours of March 12, driving a yellow Corvette. Gore had been staying with Casanova, her mother, and her mother's friend since February 1988. According to Casanova, Gore returned to her home later that day, stating that he had been injured in a car accident. At that time, Gore gave Casanova the keys to the Corvette. FBI Special Agent Carl Lowery testified that Novick's body was recovered "within a few hundred feet" from this house.
The following night, March 13, Gore went to the house of a friend, Frank McKee, and asked him if he could borrow some money and stay the night. Gore stated that the police were looking for him. Gore also informed his friend that he had recently been in a car accident involving a yellow Corvette and that he had lost some jewelry. McKee refused to allow Gore to spend the night and Gore subsequently left in a cab.
In its case-in-chief, the State also introduced Williams[2] rule evidence that Gore committed similar crimes against Roark and Coralis. The State presented evidence that Gore had murdered Roark shortly after her disappearance in January 30, 1988, by inflicting trauma to her neck and chest. In addition, evidence established that Gore stole Roark's black Ford Mustang and other personal property, then left her nude body in a rural area used as a trash dump. Similarly, the State presented evidence that Gore attacked Coralis on March 14, 1988, two days after the murder of Novick. Coralis herself testified against Gore, stating that he beat her with a rock, raped, choked and stabbed her, and left her for dead on the side of the road near the scene where Novick's body was found. Gore proceeded to steal Coralis's red Toyota sports car and personal property.
FBI agents finally arrested Gore in Paducah, Kentucky on March 17, 1988. At the time of his arrest, Gore was in possession of Coralis's red Toyota automobile and he had her bank and credit cards in the pocket of his jacket. Police officers subsequently questioned Gore regarding the Coralis and Roark crimes. According to the police, Gore denied knowing Roark or Coralis and denied all involvement in the crimes. Gore also denied knowing Novick. When police prepared to show Gore a photograph of Novick, Gore stated "just make sure it is not gory" because his "stomach could not take it." At the time that Gore made such statements, the police had yet to inform Gore that Novick was dead. Detective David Simmons of the Miami Dade Police Department testified that when Gore looked at Novick's picture, Gore's eyes "swelled with tears." Gore also stated that "if I did this, I deserve the death penalty."
In his defense, Gore took the stand and testified on his own behalf. Gore claimed that prior to his interrogation by police in Miami concerning the Novick murder, reporters previously had told him upon his arrest that Novick was dead. He also *425 claimed that during his interrogation, police had placed gruesome photographs of the murders all over the interview room. Moreover, Gore stated that police had given him a polygraph examination, which he claimed he had passed.[3]
Gore testified that he was the owner of an escort service and claimed that Coralis, Novick, Roark, and Restrepo all worked for the escort business. Gore maintained that Novick worked for him as a nude dancer and he admitted that he was with Novick at the Redlands Tavern on the evening of March 11, 1988. Gore, however, denied killing her. Gore explained that he was driving Novick's Corvette and that he had arranged for both Novick and Coralis to work as escorts that night. Gore claimed that after leaving the Redlands Tavern, he drove Novick to a club where Coralis worked. According to Gore, Novick, Coralis, and another woman left the club with three men in a Mercedes. Gore claimed that he followed this group in Novick's vehicle to a warehouse in Homestead, Florida. Gore stated that he called the warehouse later that night and that the phone was answered by a member of a pro-Castro group, with which one of the men was affiliated.
Gore testified that he spoke with Novick later that night and informed her about the accident and told her to report the car stolen so that she could collect the insurance proceeds. During this conversation, Novick told Gore that Coralis had left in the middle of the night because there were "problems" with the three clients who were angry about missing drugs and drug money. Gore claimed that he knew that Coralis previously had sold some drugs and used the proceeds to buy a new car.
Gore also testified that he spoke with Coralis a few days later, and that she was scared because someone was looking for her. Gore claimed that Coralis wanted a gun and that he had arranged a meeting with her in an effort to assist Coralis in selling the remainder of her drugs. Furthermore, Gore claimed that he later saw the men who were with Novick and Coralis on the night of the Novick murder and they told him that Novick "was picked up" from the warehouse.
Addressing his relationship with Susan Roark, Gore admitted that he knew her for many years. He acknowledged that he was with Roark on the last night that she was seen alive. He stated, however, that Roark had visited him during his incarceration in Miami, indicating that it was impossible for him to have murdered Roark. Gore also asserted that Dr. William Maples, a forensic anthropologist, could testify that Roark had been dead for only three weeks when her remains were recovered and that Gore had been in jail for six months at that time. Furthermore, Gore asserted that the evidence found at the site where Roark's body was found did not link him to the crime.
On cross-examination, Gore admitted that he previously had been convicted of committing fifteen felonies. Gore denied trying to kill Coralis and claimed that her injuries were the result of her jumping out of a moving car. Gore also asserted that all of the State witnesses had lied and he refused to explain why he was in possession of the property of people who were either killed or attacked.
Ana Fernandez testified on Gore's behalf. Fernandez worked for Gore in 1984 or 1985 when she was fifteen years old, answering phones for the escort service. *426 Fernandez claimed to have known Roark, Coralis, and Novick through her association with Gore. However, she could not state when, where, or how many times that she had met Coralis or Novick and was unable to describe them. Moreover, when presented with a photograph of several women, she could not identify Coralis.
After the close of all the evidence, the jury convicted Gore of first-degree murder and armed robbery with a deadly weapon of Novick. During the penalty phase, Gore chose to represent himself. The jury recommended that Gore be sentenced to death by a vote of twelve to zero. The trial court imposed the death penalty for the first-degree murder conviction and imposed an upward departure life sentence for the armed robbery conviction to run consecutive to any other sentence Gore was serving.
In its sentencing order, the trial court found the following three aggravating circumstances: (1) Gore was previously convicted of another capital felony involving the use or threat of violence to the person;[4] (2) the capital felony was committed while Gore was engaged in the commission of, or an attempt to commit, or in flight after committing or attempting to commit any robbery; and (3) the capital felony was committed in a cold, calculated and premeditated manner without any pretense of legal justification ("CCP"). The trial court found no statutory mitigating circumstances, but did find three nonstatutory mitigating circumstances: (1) Gore suffered hearing loss (minimal weight); (2) Gore suffered from migraine headaches (minimal weight); and (3) Gore had previously stopped an altercation between Raul and Marisol Coto (minimal weight).[5] The trial court concluded that the aggravators outweighed the mitigators and sentenced Gore to death.
Gore raises eight issues in this appeal.[6] We address the guilt-phase issues first.

GUILT PHASE

A. Double Jeopardy

In the first issue, Gore claims that by retrying him in this case, the State violated his constitutional rights by placing him in double jeopardy. Relying on Oregon v. Kennedy, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), Gore asserts that the State's actions during cross-examination of *427 Gore and closing argument were so egregious that this Court should find that the Double Jeopardy Clause of both the United States and Florida Constitutions prevented the State from retrying him in this case.
As stated by the United States Supreme Court in Kennedy, the Double Jeopardy Clause would prevent the State from retrying a defendant where it is established that the judge or prosecutor, by his or her own egregious conduct, caused the defendant to move for a mistrial, and the conduct of the judge or prosecutor "was intended to provoke the defendant into moving for a mistrial." 456 U.S. at 679, 102 S.Ct. 2083. "Only where the governmental conduct in question is intended to `goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." Id. at 676, 102 S.Ct. 2083. Despite this limited exception barring a retrial, the Double Jeopardy Clause's general prohibition against successive prosecutions does not prevent the State from retrying a defendant who succeeds in getting his conviction set aside on appeal due to some error in the proceedings below. See Lockhart v. Nelson, 488 U.S. 33, 38, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988); see also Ruiz v. State, 743 So.2d 1, 9-10 n. 11 (Fla.1999) (holding that double jeopardy did not bar State from retrying defendant despite the fact that prosecutors "attempted to tilt the playing field and obtain a conviction and death sentence"); Keen v. State, 504 So.2d 396, 402 n. 5 (Fla.1987) (holding double jeopardy did not prevent a retrial of defendant arising from prosecutorial misconduct).
Gore's reliance on Kennedy is misplaced. In the present case, Gore did not successfully abort the first trial pursuant to a motion for a mistrial. Rather, Gore's convictions were overturned on appeal. Thus, the limited Kennedy exception to the Double Jeopardy Clause does not apply here and it was not error for the State to retry Gore despite the prosecutors' actions in the first trial. See Ruiz, 743 So.2d at 10 n. 11; Keen, 504 So.2d at 402 n. 5.

B. Motion for a Mistrial

In the second issue, Gore claims that the trial court erred in denying his motion for a mistrial after the State questioned Jessie Casanova, in the course of her testimony as a State witness, about whether she had an "intimate relationship" with Gore. Gore contends that the State's question was unfairly prejudicial because Casanova was only thirteen years old at the time of the murder.
Immediately following the State's question, defense counsel objected on grounds that such questioning was improper Williams rule evidence and subsequently moved for a mistrial. The trial court denied the motion for a mistrial. However, the trial court sustained the objection and gave the following instruction to the jury:
The last objection was sustained. I'm going to strike from the record the last response made by the witness. You must disregard it in your deliberations. Are you all able to follow the instruction? Is there anyone at all who would be influenced in any way by the last responses you just heard from the witness? If so, just raise your hand. For the record, I see no hands. All jurors said they could follow that instruction.
A ruling on a motion for a mistrial is within the sound discretion of the trial court and should be "granted only when it is necessary to ensure that the defendant receives a fair trial." Goodwin v. State, 751 So.2d 537, 547 (Fla.1999) (quoting Cole v. State, 701 So.2d 845, 853 (Fla.1997)). *428 Moreover, as this Court stated in Goodwin, the use of a harmless error analysis under State v. DiGuilio, 491 So.2d 1129 (Fla.1986), is not necessary where "the trial court recognized the error, sustained the objection and gave a curative instruction." 751 So.2d at 547.
We hold that the trial court did not abuse its discretion in denying Gore's motion for a mistrial. This single question is in marked contrast to the error in the first trial when on three separate occasions during cross-examination of Gore, the prosecutor questioned Gore as to whether he had sex with a thirteen-year-old girl (referring to Casanova). See Gore, 719 So.2d at 1200. In the first trial, the trial court overruled defense counsel's timely objections to these questions. See id. In addition, our reversal resulted from the cumulation of multiple errors throughout the trial caused by the conduct of the prosecutor. See id. at 1202-03.
In the present case, the State asked Casanova one isolated question regarding the nature of her relationship with Gore. The trial court sustained the objection and immediately instructed the jury to disregard Gore's relationship with Casanova, and the State did not refer to Gore's relationship with Casanova during closing argument. Any prejudice that may have ensued from the State's improper question was exacerbated by Gore himself, who referred to the improper relationship with thirteen-year-old Casanova on several occasions during the State's cross-examination of Gore despite the fact that the State did not initiate any additional questions about Gore's relationship with Casanova. Accordingly, we hold that the trial court did not abuse its discretion in denying Gore's motion for a mistrial. See Walker v. State, 707 So.2d 300, 313 (Fla.1997); Cole, 701 So.2d at 853.

C. Motion for Judgment of Acquittal

Gore contends that the trial court erred in failing to grant his motion for a judgment of acquittal on charges of first-degree murder and armed robbery. Gore argues that the circumstantial evidence does not prove that Gore killed Novick with a premeditated design, or during the commission of a felony, as is necessary to support a finding of guilt for first-degree murder. In addition, Gore argues that the State presented insufficient evidence to support his conviction for armed robbery.
As stated in Orme v. State, 677 So.2d 258, 262 (Fla.1996), a motion for judgment of acquittal should be granted in a circumstantial evidence case if the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. See id. (citing State v. Law, 559 So.2d 187, 188-89 (Fla. 1989)).
[The court's] view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events.
Law, 559 So.2d at 188-89 (citations and footnote omitted) (quoting State v. Allen, 335 So.2d 823, 826 (Fla.1976)). "In sum, the sole function of the trial court on motion for directed verdict in a circumstantial-evidence case is to determine whether there is prima facie inconsistency between (a) the evidence, viewed in the light most favorable to the State and (b) the defense theory or theories." Orme, 677 So.2d at 262. If such inconsistency exists, then the question is for the finder of fact to resolve. See Woods v. State, 733 So.2d 980, 985 (Fla.1999). The trial court's finding will not be reversed on appeal if there is competent substantial evidence to support the *429 jury's verdict.[7]See id.; Orme, 677 So.2d at 262.

1. Premeditated Murder

We first examine Gore's contention that the trial court erred in failing to grant a judgment of acquittal on the first-degree murder charge because the State failed to present sufficient evidence to support premeditated murder. "Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill." Green v. State, 715 So.2d 940, 943 (Fla.1998). This purpose to kill must exist for sufficient time before the homicide "to permit reflection as to the nature of the act to be committed and the probable result of that act." Id. at 944. Premeditation can be shown by circumstantial evidence. See Woods, 733 So.2d at 985. As this Court has stated:
Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.
Green, 715 So.2d at 944 (quoting Holton v. State, 573 So.2d 284, 289 (Fla.1990)).
Applying these principles to this case, we hold there is competent substantial evidence supporting Gore's conviction for premeditated murder of Novick and to rebut Gore's hypothesis of innocence. The official cause of Novick's death was stab wounds to the chest associated with mechanical asphyxiastrangulation. One of the stab wounds to Novick's chest was so deep that it penetrated her heart and lung. This wound was severe enough to cause Novick's death. However, while Novick was still alive, she was strangled with a silver belt so forcefully that she suffered a fracture of her trachea. There were no defensive wounds found on Novick's body and no evidence was presented indicating that the murder was the result of a provocation or ill will between Novick and Gore.
The State presented additional evidence to support a conviction of premeditated murder, including Gore's history of targeting young, attractive women who drove sporty automobiles and thereafter killing or attempting to kill them. The State points to the fact that in this case, as in the prior similar crimes, Gore did not attack these women in haste as evidenced by the fact that no blood or any other physical evidence of foul play was found in the victims' vehicles. Rather, the evidence suggests that Gore acted with deliberation by removing the victims from their vehicles prior to stabbing them. Further, there was no evidence that any of the victims resisted or struggled with Gore, an indication that Gore acted calmly and with deliberation.
Based upon the circumstantial evidence presented in this case, we hold that there was competent substantial evidence supporting the jury's first-degree murder verdict. *430 See Crump v. State, 622 So.2d 963, 971 (Fla.1993) (holding sufficient evidence of premeditation existed to support jury's verdict where defendant struck and then strangled victim and had engaged in a pattern of similar crimes). Accordingly, the trial court did not err in denying Gore's motion for a judgment of acquittal.

2. Felony Murder and Armed Robbery

The State contends that even if the evidence did not support premeditated murder, the evidence does support Gore's conviction based upon a felony murder theory. We agree. Robbery is "the taking of money or other property which may be the subject of larceny from the person or custody of another when in the course of the taking there is the use of force, violence, assault, or putting in fear." § 812.13(1), Fla.Stat. (1989). Property that is the subject of the taking need not be in the actual physical possession or immediate presence of the person who was robbed. See Jones v. State, 652 So.2d 346, 350 (Fla.1995). "Property is taken from the person or custody of another' if it is sufficiently under the victim's control so that the victim could have prevented the taking if she had not been subjected to the violence or intimidation by the robber." Id. Under section 812.13(3)(b), Florida Statutes (1989), the violence or intimidation may occur prior to, contemporaneously with, or subsequent to the taking of the property so long as both the act of violence or intimidation and the taking constitute a continuous series of acts or events. See Jones, 652 So.2d at 349. The taking of property after a murder, however, does not constitute robbery if the motive for the murder was not the taking of property. See Mahn v. State, 714 So.2d 391, 397 (Fla.1998) (citing Knowles v. State, 632 So.2d 62, 66 (Fla.1993), Clark v. State, 609 So.2d 513, 515 (Fla.1992), and Parker v. State, 458 So.2d 750, 754 (Fla. 1984)).
We hold that there is competent substantial evidence to support the finding that Gore committed murder during the commission of a robbery. In the present case, Novick was last seen alive driving her Corvette from the Redlands Tavern, accompanied by Gore, who admitted to being with Novick at the bar that evening. Hours later, Gore was seen driving the Corvette, without Novick, telling others that the car was on loan from his girlfriend. After wrecking the car, he abandoned it and stated that it was stolen. Inside the vehicle, police recovered Novick's personal property and a "power of attorney" executed by Gore. The day after Gore wrecked the car, Gore gave a friend the keys to the vehicle and told another friend that the police were after him. Novick's body was found several days later, naked and abandoned in a remote area, within a few blocks from where Gore had attacked Tina Coralis and from where Gore previously had been staying.
The evidence also revealed that when Gore took Novick's Corvette, he did not have a car of his own. Gore's prior convictions established a pattern of attacking women in order to gain their property and use their cars. In each of these prior instances, Gore attempted to murder or actually murdered women, stole their personal possessions and cars, and left the bodies in remote areas.
In sum, there is competent substantial evidence supporting Gore's conviction for armed robbery. Therefore, we hold that the trial court did not err in denying Gore's motion for a judgment of acquittal on charges of first-degree murder and armed robbery.

D. Reverse Williams Rule Evidence

In this claim, Gore contends that the trial court erred in excluding reverse *431 Williams rule evidence pertaining to the murder of a Paulette Johnson, which Gore argues supports his hypothesis of innocence. Gore alleges that Johnson was a woman from Miami who worked for his escort service and who was murdered in Tennessee in 1989 in the very same manner as both Novick and Coralis were murdered. Gore argues that because he was incarcerated at the time of Johnson's death, evidence of Johnson's murder supported his assertions that someone else had murdered Novick.
Prior to trial, the State filed a motion in limine to prevent Gore from introducing evidence relating to the alleged murder of Paulette Johnson. The State argued that the murder of Johnson was insufficiently similar to the murders of both Novick and Roark to be admissible. In addition, the State contended that the woman murdered in Tennessee was actually named "Pauline Johnson," not "Paulette Johnson." Thus, the State argued that Gore failed to present sufficient evidence demonstrating that "Pauline Johnson" was the same "Paulette Johnson" who Gore claimed worked for his escort service. Furthermore, the State argued that any testimony concerning the death of Johnson was hearsay and inadmissible because Gore could not satisfy the test for admissibility of similar fact evidence of other crimes for exculpatory purposes. The trial court granted the State's motion stating that Gore could not establish that Pauline Johnson, the woman murdered in Tennessee, was the same Paulette Johnson who Gore claimed was involved in his escort business. In addition, the court ruled that Gore failed to show how the murder was relevant in this case.
Although the issue was revisited at trial, the court again excluded all testimony pertaining to the death of Johnson because Gore could not satisfy the test for admissibility by demonstrating the necessary relevance of the evidence.[8] Gore now argues on appeal that the trial court erred in excluding this evidence because it could have established reasonable doubt as to his guilt in the murder of Novick.
In Rivera v. State, 561 So.2d 536, 539-40 (Fla.1990), this Court addressed the situation where a defendant, standing trial for murder, attempted to raise reasonable doubt in jurors' minds by introducing evidence that a murder of a similar nature had been committed by someone other than the defendant and that the murder occurred while the defendant was in police custody. In addressing the matter, this Court stated that
where evidence tends in any way, even indirectly, to establish reasonable doubt of defendant's guilt, it is error to deny its admission. § 90.404(2)(a), Fla.Stat. (1985). However, the admissibility of this evidence must be gauged by the same principle of relevancy as any other evidence offered by the defendant.
Id. at 539; see State v. Savino, 567 So.2d 892, 894 (Fla.1990) (defendant must demonstrate "a close similarity of facts, a unique or `fingerprint' type of information" in order to introduce evidence of another crime to show that someone other than the defendant committed the instant crime).
In this case, Gore sought to introduce evidence pertaining to the murder of Pauline Johnson, which allegedly occurred while Gore was in police custody, claiming that this murder was committed in a similar manner to the murders of Novick and *432 Roark. However, Gore did not proffer the underlying facts of the Johnson murder to the trial court to enable the court to determine whether the murder was relevant and sufficiently similar to Novick's murder to warrant admissibility. Therefore, because Gore failed to show the relevance and requisite similarities between this case and the killing of Johnson, the trial court did not abuse its discretion in excluding evidence pertaining to the murder of Johnson.

PENALTY PHASE

A. CCP Aggravating Circumstance

In the present case, the trial court made extensive findings in support of the CCP aggravating circumstance.[9] Nevertheless, Gore claims that the trial court erred in finding and weighing this aggravator. We disagree. In order to prove the existence of the CCP aggravator, "the State must show a heightened level of premeditation establishing that the defendant had a careful plan or prearranged design to kill." Bell v. State, 699 So.2d 674, 677 (Fla.1997). A trial court's ruling on an aggravating circumstance will be sustained on review as long as the court applied the right rule of law and its ruling is supported by competent substantial evidence in the record. See Almeida v. State, 748 So.2d 922, 932 (Fla.1999) (citing Willacy v. State, 696 So.2d 693, 695 (Fla.1997)).
The facts of this case clearly support a finding of a heightened level of premeditation and this Court previously has affirmed findings of CCP under similar circumstances. See Wuornos v. State, 644 So.2d 1000, 1008-09 (Fla.1994) (affirming trial court's finding of CCP where evidence established that defendant lured victim to an isolated area, killed victim, and proceeded to steal victim's property, and defendant had previously killed multiple victims in similar manner). Based on our review of the record, we find that the trial court did not err in finding this aggravating circumstance.[10]

*433 B. State's Impeachment of Gore

Gore also argues that the State improperly questioned him on cross examination during the penalty phase about collateral crimes allegedly committed by Gore against other women. Gore argues that the State's questioning constituted improper Williams rule evidence and was admitted solely to demonstrate Gore's bad character or propensity to commit crime. We disagree and hold that Gore opened the door to this line of questioning by placing his propensity for violence in issue by stating that he was "not a violent person."
There is a different standard for judging the admissibility and relevance of evidence in the penalty phase of a capital case than during the guilt phase, especially where the focus of the evidence is directed towards the character of the defendant. See Hildwin v. State, 531 So.2d 124, 127 (Fla.1988). As this Court has stated:
[D]uring the penalty phase of a capital case, the state may rebut defense evidence of the defendant's nonviolent nature by means of direct evidence of specific acts of violence committed by the defendant provided, however, that in the absence of a conviction for any such acts, the jury shall not be told of any arrests or criminal charges arising therefrom.
Id. at 128; see Smith v. State, 515 So.2d 182, 185 (Fla.1987) (stating that the State properly presented evidence of defendant's prior manslaughter conviction during the penalty phase after defense witness testified that the defendant "would never harm anyone").
Similar to Hildwin, in the present case, Gore placed his character in issue by taking the stand and testifying "you heard that I'm not or not known as a violent person, and I'm not a violent person." In doing so, Gore opened the door to the State's impeachment evidence and the State proceeded to properly question Gore about his collateral acts of violence towards women to impeach Gore's assertions that he was a nonviolent person.[11] We hold that the State's questioning was proper rebuttal and the trial court did not err in allowing the State to question Gore about his prior acts of violence.

C. Gore's Self-Representation During Penalty Phase

Gore next contends that his decision to represent himself in the guilt phase closing argument and during the penalty phase was not knowing and voluntary, as required by Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 *434 (1975), because he was forced to choose between proceeding pro se or being represented by incompetent counsel. Despite Gore's unequivocal requests at trial that he be permitted to represent himself, he now argues that the trial court erred in permitting him to proceed pro se during the guilt phase closing argument and penalty phase proceedings.
We detail the actual proceedings related to this claim in order to properly evaluate Gore's assertions. Prior to the retrial in this case, Gore first complained to the trial court about the way his attorney was proceeding on several issues, including the admission of Williams rule evidence, and Gore requested that he be allowed to represent himself. Before allowing Gore to proceed pro se, in accordance with Faretta, the court inquired as to why Gore wanted to remove counsel and represent himself and determined whether Gore was competent to do so. The trial court instructed Gore of the advantages of having appointed counsel and the disadvantages of self-representation. The court also instructed Gore that should he choose to proceed pro se, he would be required to abide by the rules of criminal law and courtroom procedure. In addition, the trial court asked Gore several questions to determine whether he was competent to make a knowing and intelligent waiver of counsel. Among other areas, the court inquired into Gore's educational background, whether he was currently under the influence of drugs and alcohol, and whether he had physical or mental problems that would hinder his self-representation. The court concluded that Gore understood the dangers and disadvantages of self-representation and that he was competent to make a knowing and intelligent waiver of counsel.
At a subsequent hearing, however, Gore changed his mind and requested that his attorney be reappointed. The trial court granted Gore's request. However, immediately following the State's opening statements, Gore again informed the court that he was unhappy with the manner in which defense counsel was representing him and stated that he wished to represent himself for the remainder of the trial. After discussing the matter with the court, Gore changed his mind and stated that he did not wish to represent himself.
Despite proceeding through trial represented by defense counsel, Gore informed the trial court, prior to the guilt phase closing arguments, that he wanted to be "lead counsel" and to conduct closing argument himself. Gore stated that defense counsel deprived him of his right to testify, referring to the fact that defense counsel would not recall Gore to testify following the State's rebuttal case. In accordance with Nelson,[12] the trial court inquired into Gore's allegations. Defense counsel explained to the trial court that he had discussed the issue extensively with Gore and explained to him that the additional testimony that Gore had proposed was irrelevant.[13] Before allowing Gore to conduct *435 the guilt phase closing argument pro se, the trial court reminded Gore of the rights and pitfalls pertaining to self-representation. Furthermore, the trial court reviewed the transcript of the prior pretrial Faretta hearing and informed Gore about the responsibilities of self-representation. Gore claimed that he understood the court's instructions and proceeded to conduct his own closing argument.
At the conclusion of the closing arguments, Gore requested that counsel be reappointed for the penalty phase proceedings. Although the trial court initially granted Gore's request, Gore subsequently changed his mind and asked that he be permitted to represent himself during the penalty phase. Gore claimed that he was forced to proceed pro se during the penalty phase because defense counsel failed to secure any mental health experts or fact witnesses to testify on Gore's behalf for purposes of introducing mitigating evidence.
Appointed counsel was given the opportunity to explain to the court why he did not plan to call any experts or fact witnesses, except Gore himself, to present mitigating evidence in the penalty phase. Counsel explained the efforts that he undertook to procure the attendance of penalty phase witnesses. Defense counsel spoke with several of Gore's family members and concluded that it would not be in Gore's best interest to call them as witnesses. According to defense counsel, several of Gore's family members refused to testify for Gore, stating that if subpoenaed to testify, they "would rather be held in contempt of court than testify on [Gore's] behalf." Gore himself informed the trial court that he did not want his sister to testify on his behalf, stating, "This is something that is a problem because my sister would love nothing better than to see me dead because my previous attorneys had my sister arrested and put her in jail and gave her a conviction. Now she is in jail. All my sisters are now against me."
Counsel also explained the tactical reasons for not presenting additional lay witnesses, who Gore claimed were essential. Gore's attorney stated that he had spoken with Ana Fernandez, a witness who Gore claimed could provide mitigating evidence. Fernandez informed counsel that she had "no interest in testifying on [Gore's] behalf." Defense counsel also decided against calling Jessie Casanova as a witness. Counsel informed Gore and the court that he did not think the fact that the twenty-two-year-old Gore was "sleeping with" Casanova when she was thirteen years old would be seen as favorable by the jury.[14]
*436 In addition, defense counsel informed the court that he attempted to present expert witnesses to provide mitigating evidence pertaining to Gore's mental health. Gore's attorney tried on several occasions to have Gore reevaluated by Dr. Merry Haber. However, according to counsel, Gore refused to cooperate with Dr. Haber, who twice attempted to visit Gore in jail for purposes of interviewing him for the penalty phase proceeding. Thereafter, Dr. Haber was stricken from the penalty phase witness list after she declined to provide any assistance in Gore's case due to Gore's lack of cooperation.[15] Furthermore, counsel explained that Gore refused to be reexamined by prior experts who had interviewed and examined him in previous criminal proceedings, referring to several of them as "quacks."
Before permitting Gore to represent himself in the penalty phase, the trial court again advised Gore that he should have counsel and that it would be to his advantage. The court also inquired into Gore's education and experience. Defense counsel reminded the trial court that Gore previously had represented himself for part of the Coralis murder trial and a Faretta hearing was also conducted during Gore's first trial in this case. Gore asserted that he understood the court's instructions regarding the benefits of appointed counsel and the potential perils of self-representation. Ultimately, the trial court permitted Gore to represent himself during the penalty phase and Gore proceeded pro se.[16]
As the United States Supreme Court has stated, a defendant has the right to waive court-appointed counsel and choose to represent himself or herself. See Faretta, 422 U.S. at 835, 95 S.Ct. 2525. Once a defendant asserts the right of self-representation, the court must conduct an inquiry to determine whether the defendant is competent to make the choice and that the defendant knowingly and intelligently waived the right to counsel. See id.; see, e.g., Waterhouse v. State, 596 So.2d 1008, 1014 (Fla.1992). The Faretta Court stated:
Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open."
422 U.S. at 835, 95 S.Ct. 2525.
Although an accused has a Sixth Amendment right to waive the right to counsel and conduct his or her own *437 defense in a criminal proceeding, see Faretta, 422 U.S. at 820, 95 S.Ct. 2525, a defendant's choice between incompetent and unprepared counsel and appearing pro se is "a dilemma of constitutional magnitude." Sanchez v. Mondragon, 858 F.2d 1462, 1465 (10th Cir.1988), overruled on other grounds by United States v. Allen, 895 F.2d 1577 (10th Cir.1990). The choice to proceed pro se cannot be constitutionally voluntary if such a dilemma exists. See id. For the waiver to be voluntary, the trial court must have inquired into the reasons for the defendant's dissatisfaction with his counsel. See id. A lawyer's decision, in the exercise of his or her legal judgment, not to pursue a certain line of defense desired by the defendant does not constitute good cause for discharging counsel. See id. at 1466. The right to counsel does not require that counsel blindly follow a defendant's instructions. See United States v. Padilla, 819 F.2d 952, 956 (10th Cir.1987).
Throughout the proceedings below, Gore repeatedly changed his mind regarding whether he wished to be represented by defense counsel or proceed pro se. The trial court was extremely accommodating in granting Gore's requests to represent himself and Gore's subsequent requests to have counsel reappointed. Furthermore, before allowing Gore to proceed pro se, the trial court took the necessary steps to satisfy the dictates of Faretta and Nelson.
Addressing the merits of Gore's claim that his decision to proceed during the penalty phase was involuntary because he was forced to choose between incompetent counsel and appearing pro se, we conclude that Gore has failed to show good cause for dissatisfaction with appointed counsel. Despite Gore's assertions to the contrary, the record reflects that defense counsel spoke with family members and potential lay witnesses, reviewed existing mental health evaluations, and attempted to have Gore reevaluated by mental health experts for purposes of presenting potential mitigating evidence. Gore himself thwarted Dr. Haber's efforts to provide mitigating evidence by refusing to cooperate with her, and Gore also refused to be reexamined by several experts who previously had interviewed and examined him for other criminal proceedings. In addition, after speaking with Gore's family members and lay witnesses about testifying on Gore's behalf, defense counsel concluded that it would not be in Gore's best interest to have these witnesses testify during the penalty phase. In sum, the record reflects that defense counsel took reasonable steps to secure mitigating evidence on behalf of Gore and made strategic decisions in declining to call certain defense witnesses.
Thus, the record does not reflect that Gore was forced to make a Hobson's choice between incompetent or unprepared counsel and appearing pro se. Competent substantial evidence supports the conclusion that Gore's decision to proceed pro se was made with "eyes open." Faretta, 422 U.S. at 835, 95 S.Ct. 2525.

D. Ineffective Assistance of Penalty Phase Counsel

Gore contends that penalty phase counsel rendered ineffective assistance because he failed to secure any mental health testimony or fact witnesses to testify on Gore's behalf. Even assuming that an ineffective assistance of counsel claim could be properly asserted under these circumstances, with rare exception ineffective assistance of counsel claims are not cognizable on direct appeal. See Martinez v. State, 761 So.2d 1074, 1078 n. 2 (Fla.2000); Lawrence v. State, 691 So.2d 1068, 1074 (Fla.1997); Consalvo v. State, 697 So.2d 805, 811 n. 4 (Fla.1996). A claim of ineffective assistance of counsel may be raised *438 on direct appeal only where the ineffectiveness is apparent on the face of the record.[17]See Martinez, 761 So.2d at 1078 n. 2.
Gore is essentially arguing that he was forced to represent himself because penalty phase counsel declined to call any expert witnesses or any member of Gore's family to present mitigating evidence and that counsel's ineffectiveness is apparent on the face of the record. Despite Gore's assertions, the record reflects that defense counsel acted reasonably in seeking out and evaluating potential mitigating evidence and that counsel made strategic decisions in declining to call certain defense witnesses. Moreover, Gore himself thwarted defense counsel's efforts to secure mitigating evidence by refusing to cooperate with or be examined by several mental health experts. Accordingly, because it is not apparent from the face of the record that counsel was ineffective, we deny relief on this claim.

E. Proportionality
Finally, although not argued by Gore on appeal, this Court has an independent duty to review the proportionality of Gore's death sentence as compared to other cases where the Court has affirmed death sentences. See Jennings v. State, 718 So.2d 144, 154 (Fla.1998). The proportionality standard requires that the circumstances in the record must be reviewed in relation to other decisions to determine if the death penalty is the appropriate punishment. See Franqui v. State, 699 So.2d 1312, 1327 (Fla.1997). An independent review of pertinent case law reveals that Gore's death sentence was an appropriate penalty in this case. See Gore v. State, 599 So.2d 978 (Fla.1992); Franqui v. State, 699 So.2d 1312 (Fla.1997); Jones v. State, 690 So.2d 568 (Fla.1996); Ferrell v. State, 680 So.2d 390 (Fla.1996); Hunter v. State, 660 So.2d 244 (Fla.1995); Heiney v. State, 447 So.2d 210 (Fla.1984).
Accordingly, we affirm the convictions and sentence of death.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
NOTES
[1] At the time of this conviction, Gore was already under sentence of death for the murder, kidnapping and robbery of Susan Roark, see Gore v. State, 599 So.2d 978 (Fla.), cert. denied, 506 U.S. 1003, 113 S.Ct. 610, 121 L.Ed.2d 545 (1992), and a life sentence for the sexual battery, theft, robbery, burglary and attempted murder of Tina Coralis, see Gore v. State, 573 So.2d 87 (Fla. 3d DCA 1991), rev. denied, 583 So.2d 1035 (Fla.1991).
[2] Williams v. State, 110 So.2d 654 (Fla.1959).
[3] Gore's claims concerning the officers' use of gruesome photographs and that he was given a lie detector test were refuted by Detective Steven Parr and Detective Lou Passaro of the Miami Dade Police Department. Both testified during the State's rebuttal.
[4] This aggravating circumstance pertained to the first-degree murder, kidnaping and robbery of Susan Roark, and the attempted firstdegree murder, sexual battery, armed burglary, armed robbery, and armed kidnaping of Tina Coralis.
[5] Raul and Marisol Coto are the parents of Jessie Casanova. According to Casanova's penalty phase testimony, while Gore was living with Casanova, Marisol Coto, and Rosa Lastra, Gore broke-up an altercation between Raul and Marisol and stopped Raul from becoming violent.
[6] Gore raises the following issues: (1) the Double Jeopardy Clause of the United States and Florida Constitutions prevented the State from retrying Gore for first-degree murder and armed robbery; (2) the trial court erred in denying his motion for a mistrial following the State's questioning of Jessie Casanova about whether she had an "intimate relationship" with Gore; (3) the trial court erred in denying Gore's motion for a judgment of acquittal on charges of first-degree murder and armed robbery; (4) the trial court abused its discretion in excluding reverse Williams rule evidence pertaining to the murder of Paulette Johnson, which allegedly supported Gore's hypothesis of innocence; (5) the State introduced improper collateral crime evidence during the penalty phase; (6) the trial court erred in finding and weighing the CCP aggravating circumstance; (7) the trial court erred in permitting Gore to represent himself during the guilt phase closing argument and during the penalty phase of trial; and (8) Gore received ineffective assistance of counsel during the penalty phase.
[7] The State sought a first-degree murder conviction on alternative theories of premeditated murder and felony-murder with the underlying offenses of armed robbery. See Griffin v. United States, 502 U.S. 46, 47, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (stating that even if the evidence does not support the specific verdict, any error in charging the jury on that theory is harmless where the evidence supports a conviction for the general verdict). Because a general verdict form was used in this case, in order to affirm Gore's first-degree murder conviction, competent substantial evidence must exist to support either premeditated or felony-murder (predicated on armed robbery). See Jones v. State, 748 So.2d 1012, 1024 (Fla.1999) (citing Mungin v. State, 689 So.2d 1026, 1029-30 (Fla.1995)). In addition, competent substantial evidence must exist to support Gore's conviction for armed robbery.
[8] Despite the trial court's ruling to exclude any reference to the murder of Paulette Johnson, Gore violated the trial court's order by discussing the murder during his testimony. The trial court sustained the State's objection and subsequently held Gore in criminal contempt of court.
[9] These findings included the following: (1) Gore had a history of targeting young, attractive women who drove new sporty automobiles; (2) Gore previously was convicted of murdering Susan Roark after stabbing her to death, stealing her car and jewelry, and dumping her body in a remote area; (3) Gore did not have his own automobile and theft of Novick's automobile "was one of the motivating factors" for the murder, but "was clearly not the Defendant's sole plan"; (4) Gore murdered Novick after a "well thought-out attack," as indicated by the fact that Novick was stabbed and strangled to death, she had no defensive wounds, and her nude body was left in a remote area, "one which [Gore] reasonably believed would hide the body until nature, insects and other predators would erase any identifying evidence of the victim"; (5) Gore used the same modus operandi in the murders of Novick, Roark, and the attempted murder of Coralis; (6), Gore took his victims' jewelry and automobiles after committing murder or attempted murder; (7) Gore did not panic or act hastily and attack any of these women in their cars, as evidenced by the fact that no blood or any other physical evidence of foul play was found in the cars; rather, Gore acted calmly and with deliberation when he removed each victim from her vehicle prior to stabbing her; (8) there was no evidence to suggest that any of his victims resisted or struggled with Gore, also indicating that Gore acted calmly and deliberately when he took Novick's life; (9) Novick's injuries demonstrate that the killing was not prompted by an emotional frenzy, panic, or fit of rageNovick suffered two stab wounds to the neck and an injury to her neck and trachea caused by the extensive pressure applied by Gore during the strangulation; and (10) Novick was alive while being stabbed and strangled and eventually bled to death.
[10] Gore also argues that several of the trial court's factual findings enunciated in its sentencing order pertaining to CCP were not supported by the evidence. In particular. Gore challenges the court's finding that after stabbing Novick, Gore "looked her in the eye (since she was lying on her back, facing upward) and strangled the last bit of life out of her." In this case, there was no direct testimony that Gore looked Novick in the eye as he was killing her, and the medical examiner testified that he could not be certain whether Novick's eyes were open or closed at the time of her death. Although Gore may have "looked [Novick] in the eye" as he was killing her, there is no evidence in the record to support the trial court's finding or to rule out other scenarios. Thus, we conclude that the trial court's description of the final moments of the homicide was based upon speculation. See Knight v. State, 746 So.2d 423, 435 (Fla. 1998). However, we find this inclusion harmless in view of the other strong evidence supporting the trial court's multiple findings that support the CCP aggravating circumstance. See id. at 436.
[11] We distinguish what took place here from what occurred in Gore's first trial. In Gore's first appeal, this Court held that the State's questioning of Gore about collateral acts of violence directed at Maria Dominguez was improper because it "could only demonstrate Gore's bad character or propensity to commit crime." Gore, 719 So.2d at 1200. Importantly, in that case, the State's questions came during the guilt phase of trial and Gore had not placed his character in issue by claiming that he was a nonviolent person.
[12] Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973).
[13] The following discussion took place at sidebar regarding Gore's request of counsel that he be recalled to testify:

DEFENSE COUNSEL: My client wants to take the stand again and I don't believe from what Ibecause I asked him to tell me what relevant testimony do you have that was not discussed in your prior testimony? He wrote out some questions and whatnot, but gave me nothing relevant. Stupid questions. Why you should find me not guilty and things like that.
THE COURT: Well, if you have no relevant questions to ask him, what would be the point of him taking the stand? He can't take the stand just to make a statement to the jury.
. . . .
If you don't have any questions to ask him, I don't see what we are addressing really.
DEFENSE COUNSEL: I'm just concerned from a constitutional standpoint, if my client's right to testify extends to testifying more than once.
THE COURT: Well, what I'm saying is, I don't think I need to get to that juncture, if you have no further questions of your client. There is no reason for him to take the stand and we don't need to address whether he should be permitted to take the stand again, if you have no questions of him.
. . . .
Well, if you told me that you wanted to recall your client at this point, then we would address whether that would be appropriate. From what I understand you to say, you have no intention of recalling your client at this time because you have nothing further to ask.
DEFENSE COUNSEL: Right.
[14] After deciding to represent himself during the penalty phase, Gore had Casanova subpoenaed and she did testify for Gore during the penalty phase proceeding.
[15] Doctor Haber did interview Gore on January 15, 1999, prior to the retrial, based upon a court order regarding whether Gore was competent to proceed to trial and to represent himself. Doctor Haber found Gore to be competent to proceed and competent to represent himself. She also found him to be manipulative and seductive, coherent, logical and goal-oriented. She found no evidence of major mental illness. Doctor Haber concluded that the defendant suffered from a personality disorder and was antisocial.
[16] At the conclusion of the penalty phase proceedings, Gore requested that counsel be reappointed. When questioned by the trial court about his decision to have counsel reappointed, Gore replied, "I wish to represent myself at this point." Gore explained that he wanted to prepare a sentencing memorandum and a motion for a new trial and that he wanted counsel to be reappointed as a precautionary measure, stating that "if it becomes too much of a burden for me to do both motions, then I will have to ask for counsel to come in and take over at that point." From the record, it appears that Gore prepared both motions himself and argued the merits of his motion for a new trial at the Spencer hearing.
[17] Both this Court and several district courts of appeal have reversed cases involving ineffective assistance of counsel claims on direct appeal where counsel's representation has been impaired by conflicting interests. See Foster v. State, 387 So.2d 344, 345-46 (Fla. 1980); see also Robinson v. State, 702 So.2d 213, 215-17 (Fla.1997) (counsel ineffective for not preparing for trial, lying to the jury, offering no evidence in mitigation, and being improperly compensated); Ross v. State, 726 So.2d 317, 319 (Fla. 2d DCA 1998) (counsel ineffective for failing to object to prosecutor's comments that defense witnesses were "pathetic," "ridiculous," "inappropriate," "insulting," to the jury's intelligence, "totally incredible," and who had "just flat out" lied and failing to object to the prosecutor's characterizations of the defendant's testimony as "preposterous," "nonsense," and "bologna"); Gordon v. State, 469 So.2d 795, 797 (Fla. 4th DCA 1985) (defense counsel was ineffective for failing to object to 104 instances of improper questions and comments by the prosecutor).