# Supreme Court of Florida

_____

No. SC12-2466
_____

**COREY SMITH,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC13-2112
_____

**COREY SMITH,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[March 16, 2017]

PER CURIAM.

Corey Smith appeals an order of the circuit court denying his motion to

vacate his convictions of first-degree murder and sentences of death filed under

Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of

habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons explained below, we affirm the trial court's denial of postconviction relief as to all claims except Smith's claim relating to the constitutionality of his penalty phase, deny habeas relief, vacate Smith's death sentences, and remand for a new penalty phase.

## BACKGROUND

In December 2000, Corey Smith and seven others were indicted by a Miami-Dade County grand jury in a seventeen-count indictment for crimes committed in connection with the John Doe enterprise, which had been the subject of a joint state and federal task force. Smith v. State, 7 So. 3d 473, 479 (Fla. 2009). Smith was alleged to have been the leader of John Doe, which had processed, packaged, and distributed cocaine and marijuana in Liberty City from July 1994 through January 1999. Id. Smith was named in fourteen of the counts, including the first-degree murders of Cynthia Brown, Angel Wilson, Leon Hadley, Jackie Pope, and Melvin Lipscomb, four counts of conspiracy to commit murder, second-degree murder of Marlon Beneby, conspiracy to engage in a criminal enterprise, engaging in a criminal enterprise, conspiracy to traffic in marijuana, and conspiracy to traffic in cocaine. Id.

The facts of this case are set forth in Smith's direct appeal of his first-degree murder convictions and sentences of death:

A number of witnesses who had been involved in John Doe testified about the organization and operation of [its] seven drug holes [where drugs were distributed]. According to their testimony . . . Latravis Gallashaw was the second-in-command, and Julian Mitchell was the third. Smith started out as a member of the Lynch Mob, a drug group that predated John Doe in the same neighborhood. . . . Smith opened his own drug hole across the street from his mother's house . . . in 1994. Smith engaged in intimidation and violence to take over other drug spots or to run competitors out of business.

Each drug hole employed a number of workers, including a "bombman" who sold the drugs, a "watchout" who looked out for the police and marketed the drugs by yelling slogans to potential customers, a "gunman" who kept the peace and enforced the rules, and a "street lieutenant" who dropped off drugs and collected money. In addition, John Doe also employed [individuals] who processed and packaged the drugs for street sale, [people] who tracked the money to provide a count for paying the workers, and . . . "hit men" who carried out the group's violence. The employees worked regular shifts at their jobs and were paid in cash . . . .

Various witnesses and documentary evidence also revealed a type of accounting system through tally sheets which enabled John Doe to keep track of how much and what kind of drugs were sold and how much money was collected and paid out. Letter codes were used to indicate the type of drug and the size of the bags. Witnesses also testified that workers at the drug holes were permitted to buy guns that they might be offered by individuals and pay for them with John Doe money. The guns were kept by the workers at the holes. . . .

. . . The task force executed search warrants for various residences of John Doe members in late October and early November of 1998. The search of Smith's mother's residence revealed two homemade grenades in the attic, a 9-millimeter pistol in Smith's room, various boxes of ammunition, magazines, and clips, a bullet-proof vest, a loaded derringer in the mother's bedroom along with $850, drug residue in the kitchen, and a copy of the police report in the [Dominique] Johnson case in the nightstand of Smith's bedroom. . . . The search of the residence that Smith shared with his girlfriend Crystal Boyd uncovered a radio frequency detector to detect bugs or

wires, a phone guard that was supposed to detect wiretaps, a diamond-studded Rolex watch, $500 in cash in Smith's shorts pocket, a bag containing $185,724 in cash bundled with rubber bands, an AK-47 drum that can hold up to 75 rounds of ammunition, and a small amount of marijuana. . . .

. . . .

## Cynthia Brown Murder

Cynthia Brown died from asphyxia after being smothered by a pillow in a room at the Tradewinds Motel . . . . Brown checked into the hotel with her boyfriend Chazre Davis on the evening of July 23, 199[7], and her body was found at midday the next day. Brown's and Davis's prints were found on a mirror in the motel room.

The medical examiner testified that Brown had petechial hemorrhages in her eyes, inside her upper lip, and on her epiglottis. Brown had small abrasions under her left nostril and on her upper lip. Her lungs were full of fluid due to pulmonary edema. She also had postmortem cuts on the left side of her neck. The bed pillow had small smears of blood on the right side from Brown's face, which was consistent with the small abrasions on her face. The medical examiner stated that all of these findings were consistent with death from asphyxia caused by being smothered with the bed pillow. Toxicology showed that Brown had both cocaine and alcohol in her body at the time of death. However, both the medical examiner and the forensic toxicologist testified that the levels were not life-threatening and Brown did not die from an overdose.

During cross-examination, the defense asked the medical examiner about autoerotic asphyxia and if the victim could have died from this rather than being smothered by a pillow. When the defense asked the medical examiner to explain autoerotic asphyxia, the State objected and the court sustained that objection. The court ruled that the defense could ask the medical examiner if it applied in this case, but would have to call its own expert to explain this. The medical examiner opined that it was possible but unlikely that the victim in this case died during a sex act. . . .

Brown was the sole witness against Smith in the murder of Dominique Johnson, a nineteen-year-old drug seller . . . . Johnson was

shot twice in his arms and once through his temple. The gun was one to three inches away when Johnson was shot in the head. . . . No gunshot residue was found on Johnson's hands, indicating that he did not fire a gun. While several people apparently witnessed Johnson's shooting, only Cynthia Brown came forward and identified Smith to the police.

Smith was scheduled to be tried for Johnson's murder on July 28, 1997. David Waksman, the prosecutor in Johnson's case, testified in the instant trial that he had to dismiss the charges against Smith when Brown was discovered dead less than a week before the Johnson trial. Waksman testified that Brown was the State's sole witness in the Johnson case.

At Smith's trial in the instant case, Shaundreka Anderson, who worked with Johnson at a rival drug hole, testified that she saw Smith and Johnson arguing over money earlier in the day on which Johnson was shot. Smith approached Anderson that night and wanted to know where Johnson was. Smith had a Glock 9 gun in his hand. Smith entered the drug hole where Johnson was located and Anderson heard shots. Anderson found Johnson after he was shot. At the scene, Cynthia Brown told Anderson that she knew who killed Johnson because she had been standing behind a pole when it occurred. Anderson told Brown to mind her own business and advised her not to talk. Anderson testified that she was approached by a number of individuals who said that Smith wanted to see her. Smith offered her $2500 to help him. A few days later, Anderson gave a statement to the police in which she falsely identified another individual as Johnson's shooter. Anderson was so fearful for her safety that she cut off her dreadlocks and shaved her head as a disguise. She also left the area.

Demetrius Jones testified that he overheard a heated argument between Smith and Johnson and looked out of his bedroom window to see Smith pull a gun out of his waistband. Jones heard multiple shots and saw Johnson on the ground. Within seconds Brown approached him and said she saw who shot Johnson. Jones also advised Brown to keep silent for her safety. Neither Jones nor Anderson remained at the scene to talk to the police, but Brown did. After Smith was charged with Johnson's murder, Jones agreed to "help" Smith with his case

- 5 -

and gave a deposition to the state attorney in which he lied about Smith's involvement. Jones also admitted that he lied to Smith's defense attorney about the Johnson murder. After Jones gave his deposition and Smith was awaiting trial, Jones did not have to work and was given money from the drug holes.

Several witnesses testified that Smith wanted to get rid of the only witness who was going to testify against him in the Johnson murder case. Anthony Fail overheard a conversation between Smith and his mother about how to kill a woman without shooting her. They discussed poison and strangulation. Fail also testified that Smith offered him $50,000 to kill Brown. However, Smith was adamant that he did not want Brown shot and that he did not want the evidence leading back to him. Smith told Fail that the "junkie bitch had to go," referring to Brown. Fail did not agree to kill Brown because of this limitation and because he was on house arrest and could not move freely about the community. Fail testified that Smith put aside $20,000 to pay Brown's boyfriend for killing her. Herbert Daniels overheard a conversation between Smith and Brown's boyfriend Davis shortly before Brown was killed. Daniels heard Davis ask Smith what he wanted him to do about Brown.

Carlos Walker testified that Smith talked to him about Brown "snitching" on him. . . . Smith told Walker that Brown had to "come up dead for him to win his trial." Walker also heard Smith telling Davis to either suffocate or strangle Brown because he did not want bullets, casings, or other evidence at the scene. Walker admitted that he lied to both Smith's defense attorney and the prosecutors at his deposition when he said that Smith never discussed the Johnson case with him. Walker said he lied out of fear for his life. He said "look what happened to Jackie Pope."

Tricia Geter testified that Demetrius Jones had been paid by Smith's friend Peggy King to testify on Smith's behalf at the Johnson murder. Geter also testified that Smith asked her if she could obtain pure heroin that could be given to Brown to kill her. Smith stated that he was going to take Brown's life because she was trying to take his.

After Brown was killed, Smith told Julian Mitchell that he had to have her killed in order to win his case and now they "wouldn't be

able to take him." The day after the Johnson case was dismissed, Walker heard Smith say that the State could not hold him and that Davis had handled his business. Geter testified that she saw Davis seeking payment from Smith after Brown was killed.

Detective Alphonso testified that he discovered a copy of a deposition and the police report from the Johnson case in the nightstand of Smith's bedroom when he executed a search warrant based on the John Doe investigation. The police report was introduced to prove Smith's knowledge that Brown was the witness against him and his motive for wanting her killed. . . .

### Angel Wilson Murder

Angel Wilson was shot multiple times with a semiautomatic assault rifle while she was driving her car . . . in the early morning hours of December 1, 1998. A witness saw someone in a dark older model car with tinted windows pull up beside Wilson's vehicle and heard multiple shots. A number of witnesses saw or heard the dark vehicle speeding away from the shooting. Witnesses also heard a series of multiple shots in rapid succession. Seventeen shell casings were recovered from the scene. The bullets entered the driver's side of the vehicle and struck Wilson sixteen times. Six of these wounds were fatal. The bullet wounds also caused extensive tissue damage . . . . . She was also struck by metal fragments as the bullets pierced her vehicle. She died on the scene from massive internal injuries. The medical examiner testified that Wilson's lungs were "peppered" with pieces of the projectiles that fragmented in her body. . . .

Wilson was not the intended victim of this shooting. Her boyfriend Anthony Fail was being sought by members of John Doe who intended to kill him. Wilson and Fail were together in Wilson's car just before the shooting when they arrived at the home of Fail's stepbrother James Harvey. Harvey testified that on the night of Wilson's murder a car occupied by John Doe members Julius Stevens, Eric Stokes, Jean Henry, and "Eddie Bow" drove by his residence ten or eleven times. When Fail and Wilson arrived at Harvey's house, Harvey warned them about the car. Fail sent Wilson home because he feared for her safety. . . . At the penalty phase of trial, Detective

Alphonso testified that Julius Stevens admitted that he and Eddie Harris had shot Wilson.

Carlos Walker testified that Eddie Harris borrowed his Grand Marquis on the day of Wilson's murder. The car was returned by Harris and Eric Stokes the next day and they warned Walker that he should "lay low" with this car. Shots were fired at Walker the next time he drove his car . . . .

Various witnesses described the history between Fail and John Doe that led to these events. Fail testified that he met Smith in 1996 after Fail was released from prison. Smith had taken over Fail's drug hole . . . during Fail's incarceration. Initially, Smith and Fail worked out an arrangement about the drug hole—Fail would receive money from the operation of the hole and was given permission to get drugs and money from the hole. However, this arrangement ended when Smith ordered John Doe workers to cut Fail off. Fail had heated arguments with both Latravis Gallashaw and Smith about being cut off. Fail responded by robbing John Doe holes and shooting at the holes. Fail and his friends were also shot at by John Doe members.

Julian Mitchell, Charles Clark, Eric Mitchell, Antonio Allen, Tricia Geter, and Herbert Daniels each related the same account of a falling out between Smith and Fail over money, which resulted in Fail robbing the John Doe holes. Mitchell was given instructions to watch out for Fail and to kill him. Daniels was instructed to look for Fail and actually rode up and down the block looking for Fail on the day Wilson was killed. Mitchell was instructed by Smith and others to shoot Fail on sight. Allen heard Smith discuss the Fail problem with Julius Stevens . . . . Geter heard Smith instruct Stevens to deal with Fail because he had been robbing his drug holes. . . .

Mitchell and Fail also described a shooting that occurred outside [of a club] . . . in June 1998. In a purported gesture to end the dispute with Fail and his friends, Gallashaw gave Fail money to go out clubbing. Fail and his friends ended up at the [club] that night. While they were leaving the club, someone began shooting at them. Fail's companion Kenwan Maynard was killed. Mitchell testified that he drove a number of John Doe individuals to a night club where Fail had been spotted. These individuals had machine guns and opened

fire on someone outside the club. . . . The evidence was introduced to prove that John Doe was looking for Fail and intended to shoot him.

Id. at 480-88 (footnote omitted).

## Leon Hadley Murder

Leon Hadley was an "enforcer" for a drug organization which predated John Doe. Id. at 482. Smith told his girlfriend that Hadley had threatened to kill him, but that he was going to kill Hadley first. Id. at 483. Smith dreamed that Hadley had killed him. Id. On August 21, 1995, after stating his intent to kill Hadley, Smith put on a ski mask and jumped out of a vehicle to shoot Hadley. Id. Hadley was also shot at by another individual who was with Smith. Id. Hadley was killed, having sustained six gunshot wounds. Id. at 482. Smith told his girlfriend that he "did it" and also admitted to Anthony Fail that he killed Hadley. Id. at 483. After the shooting, Smith took over the area that had been controlled by Hadley. Id.

## Jackie Pope Murder

Jackie Pope, who was a John Doe "watchout," stated in a deposition that a member of John Doe shot a police officer at one of the drug holes. Smith was very angry about Pope's deposition and, consequently, he ordered Pope's shooting. Id. at 484-85. On March 31, 1998, Pope was killed after being shot sixteen times by John Doe "hit men." Id. at 484.

**Melvin Lipscomb and Marlon Beneby's Manslaughters**

On August 27, 1996, Melvin Lipscomb, who was a John Doe customer, broke the rules at a drug hole by talking loudly and arguing with a gunman. Id. at 488-89. Lipscomb was thereafter chased by the gunman across the street to Smith's mother's yard. Id. at 489. Smith came outside following Lipscomb's calling of Smith's name. Id. After learning Lipscomb had "disrespected the hole," Smith told his gunman to "do his ass." Id. Lipscomb sustained eleven gunshot wounds and was killed. Id. at 488.

Marlon Beneby worked as a "bombman" for John Doe. Id. at 489. Because Beneby sold his own drugs at a John Doe drug hole, on July 23, 1998, Latravis Gallashaw shot Beneby in the back. Id. This resulted in Beneby becoming a quadriplegic; Beneby ultimately died from complications due to the shooting. Id.

The defense only presented one witness at trial: the attorney who represented Smith on the first-degree murder of Dominique Johnson. Id. at 479. Smith did not testify at trial. Id. The jury convicted Smith of the first-degree murders of Cynthia Brown, Angel Wilson, Leon Hadley, and Jackie Pope; four counts of conspiracy to commit murder (Brown, Hadley, Pope, and Fail); two counts of manslaughter (Lipscomb and Beneby); Racketeer Influenced and Corrupt Organization ("RICO") conspiracy; racketeering; and conspiracy to traffic cocaine and cannabis. Id. at 489-90. At the conclusion of the penalty phase, by a vote of ten to two, the

jury recommended that Smith be sentenced to death for the murder of Brown. The jury also recommended a death sentence for Wilson's murder by a vote of nine to three. Id. at 490.[1]

In sentencing Smith for Brown's murder, the trial court found three applicable aggravators, with each receiving "great weight": (1) prior violent felony convictions (contemporaneous first-degree murders of Wilson, Hadley, and Pope; conspiracy to commit murder of Brown, Pope, and Fail; and the Beneby and Lipscomb manslaughters); (2) the murder was committed to hinder or disrupt the lawful exercise of a governmental function or the enforcement of laws because Brown was killed to prevent her testimony in the Johnson case; and (3) the murder was cold, calculated, and premeditated ("CCP"). Id. at 490-91. The trial court found that three statutory mitigators applied: (1) the lack of significant history of prior criminal activity; (2) extreme mental or emotional disturbance;[2] and (3)

---

1. No additional evidence was presented at the Spencer hearing. Id.; see also Spencer v. State, 615 So. 2d 688 (Fla. 1993).

2. However, the trial court stated that "[t]here is no evidence presented to establish [the extreme mental or emotional disturbance] mitigator." Id. at 491 n.6. On direct appeal, we found that the evidence presented actually refuted this statutory mitigator. Id.

Smith's age at the time of the murder (mid-twenties),[3] which were each given "little weight." Id. at 491.[4]

For the murder of Wilson, the trial court found the following three aggravators, assigning each of them "great weight": (1) prior violent felony convictions (contemporaneous first-degree murders of Brown, Hadley, and Pope; conspiracy to commit the murders of Brown, Pope, and Fail; and the Beneby and Lipscomb manslaughters); (2) the murder was committed for pecuniary gain because the John Doe gang members were trying to kill Wilson's boyfriend to protect the drug enterprise; and (3) CCP. Id. at 491. The trial court found the same mitigation and weight which it had found applicable to Brown's murder.[5]

Concluding that "the aggravating circumstances clearly and convincingly outweigh[ed] the mitigating factors," in both the Brown and Wilson murders, the

---

3. The trial court found no evidence that Smith's age had any impact on his thoughts, actions, or motivations. Id. at 491 n.6.

4. The trial court also considered a number of nonstatutory mitigating factors—"includ[ing] that Smith was raised in a crime infested neighborhood and a gang-controlled community, was a good family man; exhibited good behavior during trial; was exposed to chronic violence while growing up; and graduated from high school"—which were each given "little" or "some" weight. Id. at 491 & n.7.

5. The trial court additionally considered the fact that Smith did not actually shoot Wilson and never intended for her to be killed, but gave this little weight since Smith ordered the execution of Fail and that Wilson was killed as a result thereof. Id. at 491.

trial court followed the jury's death-sentence recommendations. Id.[6] We affirmed

Smith's first-degree murder convictions and sentences of death on direct appeal.

Id. at 478.[7]

---

6. The jury recommended life sentences for the murders of Hadley and Pope, which the trial court followed. Id. at 490. The trial court also sentenced Smith to consecutive thirty-year prison terms for RICO conspiracy, RICO racketeering, conspiracy to traffic in marijuana, conspiracy to traffic in cocaine, and conspiracy to commit the murders of Brown, Hadley, Pope, and Fail, and to consecutive fifteen-year prison terms for the Lipscomb and Beneby manslaughters. Id. at 492.

7. Smith raised the following claims on direct appeal:

(1) the security measures ordered by the trial court were prejudicial and violated his right to a fair trial; (2) the trial court erred in striking the jury panel that had been exposed to the out-of-court comment by Smith's mother; (3) the trial court erred in permitting a member of the John Doe organization to testify about the meaning of terms in the recorded conversations; (4) the trial court erred in admitting into evidence a police report concerning the Johnson murder that was found in Smith's bedroom; (5) the trial court erred in limiting defense cross-examination of three State witnesses; (6) the trial court erred in not granting a mistrial after the State solicited the medical examiner's opinion on an improper hypothetical question after two defense objections to this hypothetical question had been sustained; (7) the trial court erred in denying a new trial based on the State's failure to disclose a witness statement that was materially favorable to the defense; (8) the trial court erred in not holding a hearing to determine whether the State failed to disclose that a witness would testify inconsistently with his deposition and to determine whether the defense was prejudiced by this failure; and (9) the trial court erred in not granting a new trial based on prosecutorial misconduct.

Id. at 492.

- 13 -

## Postconviction Proceedings

On May 28, 2010, Smith filed a motion to vacate his convictions and sentences pursuant to rule 3.851, setting forth eight claims. In his motion, Smith requested leave to supplement or amend his claims with new or additional evidence as it becomes available as well as to add claims. The motion provided that it was incomplete because the investigation had not yet been completed as there were outstanding public records. Smith requested sixty days from the receipt of all of the records to file an amended rule 3.851 motion. On November 22, 2011, Smith filed a pro se motion to amend his rule 3.851 motion with two additional claims. On December 12, 2011, Smith's postconviction counsel moved to withdraw; Smith did not object. In granting the motion to withdraw, the trial court informed Smith that "it's going to take [new counsel] an extraordinary amount of time to prepare, probably I would say six months to a year. This is a huge case." On April 3, 2012, Smith filed a second pro se motion to amend his rule 3.851 motion.

On April 13, 2012, the trial court appointed Smith new postconviction counsel. At a hearing on May 15, 2012, the trial court asked counsel for Smith when he would be ready for a Huff[8] hearing. Smith's counsel responded that the Huff hearing could occur about six weeks later. Counsel agreed to have the Huff

---

8. Huff v. State, 622 So. 2d 982 (Fla. 1993).

hearing on July 5, 2012. On June 15, 2012, however, Smith moved to continue the Huff hearing, which was denied by the trial court. At the Huff hearing, the court scheduled the evidentiary hearing for September 24, 2012.

At the conclusion of the evidentiary hearing, the trial court stated that it would allow briefing as to the claims raised in Smith's pro se motion to amend. On October 1, 2012, postconviction counsel moved to adopt the grounds set forth in Smith's pro se motion to amend. On October 5, 2012, Smith moved for permission to amend his rule 3.851 motion and filed an amendment to the motion. On October 10, 2012, the trial court denied Smith's rule 3.851 motion. On October 18, 2012, the trial court also denied Smith's motion for permission to amend his rule 3.851 motion and the amendment, noting that the motion to amend was filed after the evidentiary hearing.

## ANALYSIS

## RULE 3.851 APPEAL

In his appeal of the trial court's denial of postconviction relief, Smith contends that: (1) the trial court erred in denying his motion to continue the Huff hearing and in refusing to allow him to amend his rule 3.851 motion; (2) the trial court erred in denying his claim of newly discovered evidence; (3) the trial court erred in finding that trial counsel was not ineffective regarding the speedy trial issue; (4) the application of the amendment to section 775.15, Florida Statutes

(Supp. 1996), which extends the statute of limitations for manslaughter, violates the ex post facto clause; (5) the trial court erred in finding that trial counsel was not ineffective regarding the failure to request a Richardson[9] hearing relating to witness Carlos Walker; (6) the trial court erred in finding that trial counsel was not ineffective during opening statements; (7) the trial court erred in not requiring the State to affirmatively disclose any files of cooperating witnesses that had been illegally made secret; (8) the trial court erred in denying an evidentiary hearing regarding the post-trial disclosure of the Tricia Geter tapes; (9) the trial court erred in summarily denying claims based on a 2006 report[10] of the American Bar Association ("ABA"); (10) the trial court erred in affirming that the lethal injection protocol did not violate the Eighth Amendment; (11) the trial court erred in finding that trial counsel was not ineffective in failing to object to the principal jury instruction relating to Smith's conspiracy counts; and (12) the trial court erred in finding that trial counsel was not ineffective in failing to object to the manslaughter jury instruction.

---

9. Richardson v. State, 246 So. 2d 771 (Fla. 1971).

10. See American Bar Association, Evaluating Fairness and Accuracy in State Death Penalty Systems: The Florida Death Penalty Assessment Report (2006).

## I.  Motion to Continue the <u>Huff</u> Hearing

Smith argues the trial court erred in denying his motion to continue the <u>Huff</u> hearing.  The denial of a motion to continue is subject to an abuse of discretion standard.  <u>See</u> <u>Gorby v. State</u>, 630 So. 2d 544, 546 (Fla. 1993).  "An abuse of discretion is generally not found unless the court's ruling on the continuance results in undue prejudice to the defendant."  <u>Doorbal v. State</u>, 983 So. 2d 464, 486 (Fla. 2008).

Smith's postconviction counsel was appointed on April 13, 2012.  On May 15, 2012, Smith's counsel agreed to having the <u>Huff</u> hearing on July 5, 2012.  But on June 15, 2012, Smith moved to continue the <u>Huff</u> hearing pending a "finalized" rule 3.851 motion.  In the motion, counsel stated that it was represented to him that the rule 3.851 motion, when filed, was not complete and that prior postconviction counsel was in the process of receiving more public records from the registry.  Counsel further provided that the review of such records might reveal additional grounds for relief, which might need to be investigated.  Counsel also noted his intent to meet with Smith regarding the rule 3.851 motion and any amendments or deletions thereto.

At the hearing on the motion to continue, Smith's counsel maintained that when he agreed to the <u>Huff</u> hearing date, he thought it would only be a matter of "getting up to speed" on the issues presented before the court in the rule 3.851

motion. Smith's counsel stated that he had since learned of the ongoing investigation of the outstanding record requests pertaining to the supplementing of the rule 3.851 motion. Counsel requested that the court afford him an opportunity to meet with Smith, review the forty or fifty boxes of material, and review the completed public records, which might reveal additional grounds for relief and require further investigation. Smith's counsel expressed that the rule 3.851 motion might be amended mainly as to mitigation, provided that Smith be evaluated by a forensic psychologist. The trial court informed counsel that it would allow for Smith to be evaluated before the Huff hearing and hold a hearing on the matter. The trial court denied Smith's motion to continue the Huff hearing.

We conclude that the trial court did not abuse its discretion in denying a continuance. We note that Smith has not shown that the claims he eventually sought to add were based on counsel's review of the public records. We also find it important that, at the Huff hearing, the trial court accommodated the defense by granting requests to further brief issues. The trial court told counsel that he could brief whatever issues he desired—including the issues of ineffectiveness of trial counsel pertaining to speedy trial and the suppression of the Tricia Geter tapes— and that it would not make a final ruling until after the evidentiary hearing. The trial court also allowed counsel to brief, following the Huff hearing, the claim of ineffectiveness of penalty phase counsel relating to mitigation. We note that there

is no indication that Smith was evaluated by a forensic psychologist in postconviction for mitigation purposes. Finally, while the trial court told Smith on December 13, 2011, of the "extraordinary amount of time . . . six months to a year" for new counsel to prepare in this case, the trial court was not obligated to afford counsel such an amount of time. The time between appointment of counsel and the evidentiary hearing was approximately five and a half months. We therefore affirm the trial court's denial of a continuance.

## II. Motion to Amend the Rule 3.851 Motion

Smith next argues that the trial court erred in denying his motion to amend his rule 3.851 motion, which he filed after the evidentiary hearing. The trial court's denial of a motion to amend is subject to an abuse of discretion standard. Moore v. State, 820 So. 2d 199, 205-06 (Fla. 2002). In Tanzi v. State, 94 So. 3d 482 (Fla. 2012), we explained:

> A trial court does not abuse its discretion in refusing to grant leave to amend when the facts asserted in the amended motion are vague, nonspecific, and fail to suggest how relief may be warranted. Additionally, a trial court does not abuse its discretion when the facts in the amended motion "were readily available to postconviction counsel at the time that [the defendant] filed his initial 3.851 motion and, therefore, these claims should have been raised in that motion."

Id. at 495 (citation omitted) (quoting Lugo v. State, 2 So. 3d 1, 19 (Fla. 2008)). "While defendants should not be given an unlimited opportunity to amend, due process demands that some reasonable opportunity be given to defendants who

make good faith efforts to file their claims in a timely manner and whose failure to comply with the rule is more a matter of form than substance." Bryant v. State, 901 So. 2d 810, 819 (Fla. 2005).

In this case, the evidentiary hearing occurred on September 24, 2012. Thereafter, on October 5, 2012, Smith filed the instant motion to amend his rule 3.851 motion, maintaining that counsel's trial schedule since his August 2, 2012, visit with Smith had only permitted him to prepare for the evidentiary hearing. Under Florida Rule of Criminal Procedure 3.851(f)(4), a motion "may be amended up to 30 days prior to the evidentiary hearing upon motion and good cause shown." Fla. R. Crim. P. 3.851(f)(4) (2012) (emphasis added). Because Smith's motion to amend was filed after the evidentiary hearing, the motion was untimely filed. We conclude, therefore, that the trial court did not abuse its discretion in denying Smith's motion to amend his rule 3.851 motion. We note that the claims Smith sought to raise in his motion to amend were neither based on public records nor involved mitigation evidence—the stated reasons Smith's counsel articulated in requesting a delay of the Huff hearing.[11] Accordingly, we affirm the denial of relief.

---

11. Smith's motion to amend consisted of claims that his trial counsel was ineffective as to tolling the speedy trial period and in presenting a defense to expert testimony regarding Cynthia Brown's death, and that the State failed to disclose that Demetrius Jones committed perjury in federal court—in a case in which Smith

### III. Claim of Newly Discovered Evidence

Smith claims that the trial court erred in denying his claim of newly discovered evidence, which consisted of an affidavit executed by Chazre Davis. To prevail on this clam, Smith must satisfy the following two-prong test:

> Two requirements must be met in order for a conviction to be set aside on the basis of newly discovered evidence. First, in order to be considered newly discovered, the evidence "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence."
>
> Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. To reach this conclusion the trial court is required to "consider all newly discovered evidence which would be admissible" at trial and then evaluate the "weight of both the newly discovered evidence and the evidence which was introduced at the trial."
>
> In considering the second prong, the trial court should initially consider whether the evidence would have been admissible at trial or whether there would have been any evidentiary bars to its admissibility. Once this is determined, an evaluation of the weight to be accorded the evidence includes whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence.

Jones v. State, 709 So. 2d 512, 521 (Fla. 1998) (citations omitted) (quoting Torres-Arboleda v. Dugger, 636 So. 2d 1321, 1324-25 (Fla. 1994); Jones v. State, 591 So. 2d 911, 916 (Fla. 1991)). In reviewing the trial court's decision on a newly discovered evidence claim following an evidentiary hearing, where the court's

---

was a defendant—and that Jones was not prosecuted for violating his plea agreement.

findings are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact, credibility of the witnesses, or the weight given to the evidence by the trial court. Id. at 532.

For this claim, Smith presented Davis's October 21, 2009, affidavit, which provided as follows:

> I. That there is absolutely no affiliation between me and the so call [sic] "John Doe Boys" or the "John Doe Gang" . . . To which allegedly was headed by this person Corey Smith. II. That this person Corey Smith nor anyone affiliated with the John Doe Gang never advised me, encouraged me, intimidated me nor sought out to pay me to murder or kill anyone . . . To which includes the person known to me as Cynthia "Cookie" Brown whom unfortunately is deceased. III. That prior to Corey Smith being arrested I was approached by Detectives Aguero and [Francisco] Alfonso and was first, encouraged to give false statements regarding Corey Smith, and then later, I was intimidated and threaten [sic] to do so. All the while being told by Detectives [sic] Alfonso that they intend to do what ever [sic] they have to do, and no matter who they have to use to see that Corey Smith will never see the street again, and they will kill him in prison. The affiant states nothing further.

At the September 24, 2012, evidentiary hearing, Davis denied any involvement in the murder or conspiracy to kill Cynthia Brown, who was his girlfriend in the early 1990s. Davis maintained that he never implicated Smith in Brown's murder. He testified that in 1997 he was interviewed by detectives, who wanted him to testify that Smith paid him to take Brown to a hotel so that she could be killed. Davis was promised little or no jail time so long as he would testify as the detectives wanted. If he did not, then the detectives would ensure that

- 22 -

he would receive the electric chair. Davis said he told the detectives that on the night in question he was with Brown at the hotel, but he left the hotel while Brown was alive. Davis asserted that Carlos Walker had a problem with him because Walker thought Davis was after his girlfriend.

Davis also testified that he did not notify Smith or Smith's counsel that he had information pertaining to Brown. Davis claimed to have voluntarily executed the affidavit after he was cautioned by a friend that if he did not clear himself "from them people, they gonna [sic] link[] you to them." Smith did not request that Davis execute the affidavit, nor did anyone else make such a request on Smith's behalf. In August 2010, Davis pleaded guilty to second-degree murder of Brown and conspiracy to commit first-degree murder of Brown. Sergeant Alfonso testified at the evidentiary hearing that he did not promise Davis anything, nor did he threaten or coerce Davis to confess to the murder or implicate anyone else. Sergeant Alfonso further explained that the lead investigator did not threaten Davis, promise him anything, or coerce him to implicate Smith.

The trial court found Davis not to be credible at the evidentiary hearing and observed that Davis did not state that he would have testified at Smith's trial if asked to do so. The trial court concluded that even if Davis had testified at Smith's

trial,[12] Smith failed to establish that the result would have been different, reasoning that the trial testimony was "quite extensive" as to Smith arranging to have Brown killed. Consequently, the trial court denied relief based on this claim of newly discovered evidence.

Assuming arguendo that Smith satisfies the first prong of Jones, we conclude that Smith fails to meet the second prong of Jones. The postconviction evidence shows that Davis denied any involvement in the murder or conspiracy to murder Brown, and denied implicating Smith in the murder. Contrary to Davis's account, Sergeant Alfonso testified that Davis was not promised anything, threatened, or coerced to confess or implicate Smith in the murder. This alleged newly discovered evidence also tends to show that Walker disliked Davis and arguably had a motive to testify falsely at Smith's trial when he implicated Davis in Brown's murder. The trial court's finding that Davis was not credible is supported by competent, substantial evidence.[13]

At trial, the State's evidence of Smith's involvement in Brown's murder was strong. The evidence established that Smith desired to get rid of Brown, who was

---

12. The trial court speculated that Davis would "probably" have refused to testify on Fifth Amendment grounds since charges were pending against him at the time.

13. As noted above, Davis pleaded guilty to second-degree murder and conspiracy to commit first-degree murder for the death of Brown.

the sole witness against Smith in the Dominique Johnson murder trial. <u>Smith</u>, 7 So. 3d at 485. Brown was murdered less than a week before that trial was scheduled to begin. <u>Id.</u> A copy of the police report relating to the Johnson case was located in the nightstand of Smith's bedroom. <u>Id.</u> at 487. Anthony Fail testified that he overheard Smith and his mother discuss how to kill a woman without shooting her. <u>Id.</u> at 486. Smith offered Fail money to kill Brown. <u>Id.</u> Smith told Fail that Brown "had to go," and that Smith put aside $20,000 to pay Davis for killing her. <u>Id.</u> Shortly before Brown was murdered, Herbert Daniels overheard Davis ask Smith what he wanted him to do about Brown. <u>Id.</u> Walker testified that Smith talked to him about Brown "snitching" on him, that Smith told him that Brown had to "come up dead for him to win his trial," and that he heard Smith telling Davis to either suffocate or strangle Brown because he did not want bullets, casings, or other evidence at the scene. <u>Id.</u> Moreover, the day following the dismissal of the Johnson case, Walker heard Smith say that the State could not hold him and that Davis "had handled his business." <u>Id.</u> at 487.

Additionally, Tricia Geter testified that Smith said that he was going to take Brown's life because she was trying to take his, that Smith asked her if she could obtain pure heroin that could be given to Brown to kill her, and that she saw Davis seeking payment from Smith after Brown was killed. <u>Id.</u> at 486-87. Finally, after

- 25 -

Brown's murder, Smith told Julian Mitchell that he had to have Brown killed in order to win his case. Id. at 487.

We conclude that the alleged newly discovered evidence is not of such nature that it would probably produce an acquittal on retrial. Accordingly, we affirm the trial court's denial of relief on this claim.

## IV. Ineffective Assistance of Trial Counsel Claims

Smith argues that his trial counsel provided ineffective assistance relating to his speedy trial rights, in failing to object to the manslaughter jury instruction, in failing to request a Richardson hearing, in making certain opening statements, and in failing to object to the principal jury instruction in connection with the conspiracy counts.

Following the Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), this Court explained that the following two factors must be established in order to prevail on ineffective assistance of counsel claims:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

Bolin v. State, 41 So. 3d 151, 155 (Fla. 2010) (quoting Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986)).

There is a strong presumption that trial counsel's performance was not deficient. See Strickland, 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). "Judicial scrutiny of counsel's performance must be highly deferential." Id. In demonstrating prejudice, the defendant must show a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. Shellito v. State, 121 So. 3d 445, 451 (Fla. 2013).

## A. Speedy Trial

Smith argues that the trial court erred in summarily denying his claim that his trial counsel was ineffective in failing to preserve his speedy trial rights based on the failure to file a notice of expiration of the speedy trial period. We disagree.

An evidentiary hearing must be held on an initial 3.851 motion whenever the movant makes a facially sufficient claim that requires a factual determination. See Amendments to Fla. Rules of Crim. Pro. 3.851, 772 So. 2d 488, 491 n.2 (Fla. 2000). Because a court's decision whether to grant an evidentiary hearing on a rule 3.851 motion is ultimately based on written materials before the court, its ruling is tantamount to a pure question of law, subject to de novo review. See State v. Coney, 845 So. 2d 120, 137 (Fla. 2003).

The record reveals that Smith's trial counsel did in fact file a notice of expiration of time for speedy trial on September 23, 2004. Smith was properly brought to trial on October 4, 2004, which was within fifteen days of the notice of expiration. See State v. Salzero, 714 So. 2d 445, 447 (Fla. 1998) ("We hold that a violation of the five and ten-day periods provided in rule 3.191(p)(3) is harmless if a defendant is actually brought to trial within fifteen days of filing his notice of expiration."). Moreover, Smith failed to allege prejudice, i.e., that the State could not have brought him to trial within the recapture period under Florida Rule of

Criminal Procedure 3.191(p)(3).  Based on the foregoing reasons, we affirm the summary denial of this claim.[14]

On October 5, 2012, Smith moved to amend his rule 3.851 motion, contending that trial counsel was ineffective in agreeing to toll the speedy trial clock without authorization and in misrepresenting Smith's position to the trial court.  The record reveals that the State informed the trial court that the parties had agreed to a tolling of the speedy trial period, not a waiver, for sixty days, in order to resolve an alleged Interstate Agreement on Detainers Act violation raised in Smith's motion to dismiss.  Defense counsel responded that the State's representation of the terms of the agreement was correct, except for its reference to sixty days.  Defense counsel believed that the parties had agreed to a thirty-day tolling.  The parties then compromised with forty-five days.  Smith did not attend this hearing.

---

14.  Smith's reliance on Gee v. State, 13 So. 3d 68 (Fla. 1st DCA 2009), and Smith v. State, 988 So. 2d 693 (Fla. 2d DCA 2008), is misplaced.  Unlike in the instant case, the defendant in Gee alleged that trial counsel failed to file a notice of expiration of speedy trial time, which was not refuted by the record, and included an allegation of prejudice.  13 So. 3d at 69.  In Smith, the district court reversed the summary denial and remanded with instructions to strike the legally insufficient claim with leave to amend in light of the then-recent decision from this Court in Spera v. State, 971 So. 2d 754 (Fla. 2007).  Smith, 988 So. 2d at 694.  Spera does not afford Smith relief because the trial court found that Smith's motion was untimely, not that there was a pleading deficiency.

Defense counsel represented to the court that he spoke with Smith immediately preceding the hearing, that counsel explained to Smith "exactly what we are doing here today," and that Smith had no objection. While it appears that defense counsel informed Smith of a thirty-day tolling period, the fact that the compromised agreement reached in court was for forty-five days should be of no consequence since Smith told counsel that he had no objection to a tolling. Trial counsel is not required to obtain the defendant's consent to "every tactical decision." Florida v. Nixon, 543 U.S. 175, 187 (2004); see also Taylor v. Illinois, 484 U.S. 400, 417-18 (1988) (providing that an attorney has authority to manage most aspects of the defense without obtaining his client's approval). We conclude that even if Smith's amendment to his rule 3.851 motion was timely filed, we would find this claim contained therein to be without merit.

### B. Manslaughter Jury Instruction

Smith contends that the trial court erred in denying his claim that his trial counsel was ineffective in allowing the jury instruction on manslaughter because the statute of limitations for the offense had run as to victims Leon Hadley and Melvin Lipscomb. Smith contends that the application of section 775.15(2)(b), which extended the statute of limitations for manslaughter, violated the Ex Post Facto Clause. We initially conclude that Smith's claim as it relates to the killing of Hadley is unpreserved and procedurally barred. See Doyle v. State, 526 So. 2d

909, 911 (Fla. 1988) (finding a claim procedurally barred because it was not presented to the trial court in the defendant's rule 3.850 motion and could not be raised for the first time on appeal).

Effective October 1, 1996, the Florida Legislature amended section 775.15 and provided that a prosecution for "a felony that resulted in a death" may be commenced at any time. Ch. 96–145, § 1, at 130, Laws of Fla. (1996). The Legislature stated that the amendment "shall apply to pending cases the prosecution of which has not been barred prior to this date." Id. § 2.

Because the manslaughter offenses as to Hadley and Lipscomb were not time-barred on October 1, 1996, the statute of limitations had not run for these offenses when Smith was indicted in December 2000. We reject Smith's contention of an Ex Post Facto Clause violation. Further, Smith was convicted of the first-degree murder of Hadley, and there is no statute of limitations for the crime of first-degree murder.[15] Thus, trial counsel cannot be deemed ineffective for failing to raise a nonmeritorious issue. See Johnson v. State, 903 So. 2d 888, 899 (Fla. 2005). Accordingly, we affirm the trial court's denial of relief.

---

15. First-degree murder is a capital felony. § 782.04(1)(a), Fla. Stat. (1995). "A prosecution for a capital . . . felony may be commenced at any time." § 775.15(1), Fla. Stat. (1995). "[M]anslaughter as a lesser included offense is two steps removed from first-degree murder." State v. Montgomery, 39 So. 3d 252, 259 (Fla. 2010).

Smith additionally argues that the trial court erred in summarily denying his claim that his trial counsel was ineffective in failing to object to the manslaughter instruction on the ground that it violated our decision in State v. Montgomery, 39 So. 3d 252 (Fla. 2010). Smith raised this claim in his pro se motion to amend, but such motion was a nullity because Smith was represented by postconviction counsel at the time it was filed. See Logan v. State, 846 So. 2d 472, 476-78 (Fla. 2003); Davis v. State, 789 So. 2d 978, 981 (Fla. 2001).

Even if the motion was properly adopted by Smith's postconviction counsel, we find the claim has no merit. In Montgomery, we held that giving the standard jury instruction for the completed crime of manslaughter by act—which required the jury to find that the defendant intended to kill the victim—is fundamental error when the defendant is convicted of an offense not more than one step removed from manslaughter because the manslaughter statute does not require an intent to kill. 39 So. 3d at 259. Smith's manslaughter convictions became final before this Court decided Montgomery. Smith's contention that Montgomery is retroactive is a new basis for his claim, and therefore, it is not properly before this Court. See Griffin v. State, 866 So. 2d 1, 11 n.5 (Fla. 2003) ("On appeal, Griffin alleges a new basis for his claim of judicial bias. . . . However, this new claim is not properly before this Court."). Moreover, we have repeatedly held that trial counsel cannot be deemed ineffective for failing to anticipate changes in the law or jury

instructions.  See Walton v. State, 847 So. 2d 438, 445 (Fla. 2003).  Finally, we reject Smith's conclusory assertion that the manslaughter instruction affected his murder convictions.

## C.  **Richardson** Hearing

Smith also asserts that his trial counsel was ineffective for failing to request a Richardson hearing involving State witness Carlos Walker's trial testimony. Finding it to be procedurally barred, the trial court summarily denied this claim.

On direct appeal, we addressed Smith's claim that the trial court erred in not conducting a Richardson inquiry when Walker testified inconsistently with his deposition.  Smith, 7 So. 3d at 504-07.  We determined that the preserved claim— that the State called Walker to testify without informing the defense that he had lied in his deposition—was adequate to inform the trial court that a discovery violation had occurred and prompt an inquiry into the circumstances and whether the defense was prejudiced.  Id. at 506.  We concluded that the State committed a discovery violation by failing to disclose to the defense a material change in Walker's deposition, as he had mentioned to the State before trial that he would implicate Smith in the murders at trial.  Id.  However, we concluded that the defense was not procedurally prejudiced by the violation and that the error was harmless.  Id. at 507.

Having previously addressed the <u>Richardson</u> claim relating to Walker's

testimony, we affirm the trial court's rejection of this claim. <u>See</u> <u>Cherry v. State</u>,

659 So. 2d 1069, 1072 (Fla. 1995) ("[A]llegations of ineffective assistance cannot

be used to circumvent the rule that post-conviction proceedings cannot serve as a

second appeal.") (quoting <u>Medina v. State</u>, 573 So. 2d 293, 295 (Fla. 1990)).[16]

### D. Opening Statements

Smith contended in his rule 3.851 motion that his trial counsel was

ineffective during opening statements by explaining that the evidence at trial would

show that Cynthia Brown died of a drug overdose, which was inconsistent with the

medical examiner's testimony, and by failing to argue that Brown died from sexual

asphyxia.[17] In his amendment to his rule 3.851 motion, Smith maintained that trial

counsel was ineffective in pursuing the alternative causes of death theories relating

to Brown's death. Smith explained that during opening statements, his trial

counsel stated that Brown simply died of a drug overdose, which would be refuted

by the medical examiner's testimony. Smith also alleged that his trial counsel first

---

16. We reject Smith's argument that an incorrect standard on direct appeal was employed by this Court. We also note that the Supreme Court's decision in <u>Delaware v. Van Arsdall</u>, 475 U.S. 673 (1986), which Smith relies on, does not involve a <u>Richardson</u> matter.

17. The trial court summarily denied Smith's additional claim that his trial counsel was ineffective in failing to hire a defense expert. Smith does not appeal this ruling.

mentioned autoerotic asphyxiation during the cross-examination of the medical examiner, but the defense was without any factual basis. The trial court found the claim legally insufficient because Smith failed to allege that an expert would have testified that Brown died from a drug overdose or sexual asphyxia.

The record reflects that trial counsel stated during opening statements that there was foam coming out of Brown's mouth—consistent with a drug overdose. Trial counsel told the jury that the evidence would show that Brown was not murdered; rather, that she died simply from a drug overdose. The jury heard evidence that Brown died from asphyxia after being smothered by a pillow. Smith, 7 So. 3d at 485. Brown's manner of death was ruled a homicide, and she did not die from a drug overdose. Although there was evidence of cocaine and alcohol found in Brown's body at the time of her death, such levels were not life-threatening, according to medical examiner Dr. Emma Lew and the forensic toxicologist. Id.

Defense counsel asked Dr. Lew on cross-examination if it was possible that Brown could have suffered a heart attack after having sex and using cocaine. Id. at 499. Dr. Lew answered that it was possible and consistent with the evidence. Id. Dr. Lew responded in the affirmative to the defense counsel's question of whether any level of cocaine could kill a person. Smith's counsel also asked Dr. Lew if it was possible that Brown died from asphyxiation while having sex with her face in

a pillow.  Id.  Dr. Lew was asked to explain autoerotic asphyxia.  Id. at 485.  The State's objection was sustained, with the trial court ruling that the defense could ask Dr. Lew if autoerotic asphyxia applied in this particular case, but that the defense would have to call its own expert to explain the term asphyxia.  Id.  Dr. Lew opined that it was possible—although unlikely—that Brown died during a sex act.  Id.  Defense counsel never called Dr. Lew or any other expert as a defense witness to testify about autoerotic asphyxiation.  Id. at 500.  We observed on direct appeal "that defense counsel was able to extensively question Dr. Lew about the cause of Brown's death.  Through his questioning, counsel was also able to call into question the manner of death as homicide.  He was able to explore his death during sex scenario fairly extensively."  Id.

Even if Smith's amendment to his rule 3.851 motion was filed timely, we conclude that Smith has failed to demonstrate that his trial counsel was deficient during opening statements.  We note that defense counsel was able to elicit some evidence supporting the opening statement that Brown was not murdered.  Trial counsel asked Dr. Lew "if it was possible that Brown could have had a heart attack after having sex and using cocaine and the other person staged her body when he realized she was dead.  Dr. Lew stated it was possible and was consistent with the evidence."  Id. at 499.  In addition, on direct-examination, Dr. Lew described white

foam material coming out of the corner of Brown's mouth. Accordingly, we affirm the denial of relief on this claim.[18]

### E. Principal Jury Instruction

Smith further contends that the trial court erred in summarily denying his claim that his trial counsel was ineffective in failing to object to the principal jury instruction in connection with the conspiracy counts brought against him. Because Smith raised this claim in his pro se motion to amend, which he filed while he was represented by postconviction counsel, the pro se motion was a nullity. See Logan, 846 So. 2d at 476-78; Davis, 789 So. 2d at 981. Furthermore, this claim consisted of merely a conclusory allegation; Smith failed to allege how the outcome would have been different had trial counsel objected to the principal jury instruction. See

---

18. Robinson v. State, 702 So. 2d 213 (Fla. 1997), does not afford Smith relief. Robinson was "an extremely unusual case," involving a questionable relationship between the trial judge—who was indicted with incidents of bribery during the trial—and the defense counsel, who failed to adequately prepare for trial. Id. at 214, 217. After failing to present any evidence supporting his opening statement, defense counsel argued during closing arguments that he had lied to the jury in order to shock them to get their attention and question the State's case. Id. at 215-16. The defendant's trial counsel was disciplined for his conduct at the trial relating to his opening statement and closing arguments. Id. at 216. Defense counsel put on almost no evidence in mitigation and improperly accepted money from his client's family. Id. at 217. We reversed the defendant's convictions and sentences and ordered a new trial "to maintain the integrity and credibility of the judicial process." Id. at 214, 217. This Court noted that "[w]hile any one of these circumstances taken alone might be insufficient to warrant a new trial or be considered harmless error, when considering these factors combined we cannot conclude that [the defendant] received a fair and impartial trial." Id. at 217.

Jones v. State, 998 So. 2d 573, 584 (Fla. 2008) ("A mere conclusory allegation that the outcome would have been different is insufficient to state a claim of prejudice under Strickland; the defendant must demonstrate how, if counsel had acted otherwise, a reasonable probability exists that the outcome would have been different . . . .").[19] Accordingly, we affirm the summary denial of this claim.

Based on the foregoing, we affirm the trial court's decision to deny the various ineffective assistance of counsel claims raised by Smith.

## V. Claim of Secret Files

Smith contends that the trial court erred in not requiring the State to disclose any cooperating witnesses' files that had been illegally made secret. Smith concedes that his rule 3.851 motion failed to include specific instances of hidden files and that he has no way of knowing whether his case has been impacted, but nonetheless argues that the State must have the burden to reveal the existence of all secret dockets.

We conclude that this claim was insufficiently pled and speculative. See Rodriguez v. State, 39 So. 3d 275, 290-91 (Fla. 2010) (denying, as speculative, the defendant's claim seeking the disclosure of secret dockets because the defendant

---

19. We reject Smith's reliance on Evans v. State, 985 So. 2d 1105 (Fla. 3d DCA 2007), and McKay v. State, 988 So. 2d 51 (Fla. 3d DCA 2008), which involved the granting of relief due to the ineffective assistance of appellate counsel.

failed to present any evidence that a secret docket existed); Maharaj v. State, 778 So. 2d 944, 951 (Fla. 2000) ("Postconviction relief cannot be based on speculation or possibility."). To the extent that Smith contends that the burden of proof for Brady[20] claims should shift to the State, we reject this assertion. See Franqui v. State, 59 So. 3d 82, 101 (Fla. 2011). Accordingly, we affirm the trial court's denial of this claim.

## VI. The Tricia Geter Tapes

Smith contends that the trial court erred in summarily denying his Brady claim in postconviction as to the alleged concealment of the Tricia Geter tapes. After appealing his convictions and sentences of death, Smith claimed—in an amended motion for a new trial—that the State recorded a series of telephone calls between him, Geter, and Latravis Gallashaw consisting of thirty-nine tapes. Smith represented that it was not until after his trial concluded when the defense became aware of the recorded telephone calls. The defense claimed that the recorded calls could have been used at trial to cross-examine Geter. The trial court did not rule on the amended motion for a new trial.

In summarily denying this claim, the trial court found that Smith failed to state any impeachment that could have been used at trial and that "[m]ere allegory [sic] conclusions are not grounds for postconviction relief." We conclude that

_____

20. Brady v. Maryland, 373 U.S. 83 (1963).

Smith's claim is facially insufficient because he failed to allege that had the tapes been disclosed to the defense at trial there is "a reasonable probability that . . . the result of the proceeding would have been different." See Guzman v. State, 868 So. 2d 498, 506 (Fla. 2003) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). Accordingly, we affirm the trial court's denial of relief on this claim.

## VII. The ABA Report

Smith contends that the trial court erred in summarily denying his claims relating to a 2006 ABA report which, according to Smith, found Florida's death penalty system unconstitutional. During the pendency of Smith's case, the United States Supreme Court found Florida's death penalty scheme unconstitutional in Hurst v. Florida, 136 S. Ct. 616 (2016), as an extension of Ring v. Arizona, 536 U.S. 584 (2002). We have interpreted Hurst v. Florida to require a jury to unanimously find each aggravating factor, that the aggravating factors are sufficient to warrant death, and that the aggravating factors outweigh the mitigation. See Hurst v. State, 202 So. 3d 40, 57 (Fla. 2016), petition for cert filed, No. 16-998 (U.S. Feb. 16, 2017). We have also determined that most defendants sentenced to death after the Ring decision should receive the benefit of Hurst. See Mosley v. State, 41 Fla. L. Weekly S640, S641 (Fla. Dec. 22, 2016). Smith, whose sentence became final in 2009, is one such defendant.

Because <u>Hurst</u> applies to Smith, we must consider whether it is clear beyond a reasonable doubt that a rational jury would have unanimously found all the facts necessary for imposition of death and unanimously recommended death, such that any <u>Hurst</u> error is harmless. <u>See</u> <u>Mosley</u>, 41 Fla. L. Weekly at S641. In this case, the jury's recommendations of death were not unanimous, and the jury made no findings concerning the aggravating and mitigating circumstances. The jury recommended death for the Brown murder by a vote of ten to two and for the Wilson murder by a vote of nine to three. Therefore, we cannot conclude that the error in Smith's penalty phase was harmless beyond a reasonable doubt. Accordingly, Smith is entitled to a new penalty phase.

## VIII. Lethal Injection Protocol

Smith argues that the trial court erred in summarily denying his claim that the lethal injection protocol violates the Eight Amendment to the United States Constitution.[21] We have consistently held that the current lethal injection protocol in Florida is not unconstitutional. <u>See</u> <u>Davis v. State</u>, 142 So. 3d 867, 871-73 (Fla. 2014); <u>Henry v. State</u>, 134 So. 3d 938, 946-49 (Fla. 2014); <u>Muhammad v. State</u>, 132 So. 3d 176, 196 (Fla. 2013) ("[W]e reject his constitutional challenge to the use of midazolam hydrochloride in the lethal injection procedure."), <u>cert. denied</u>,

---

21. Smith further seeks to reserve the right to challenge the constitutionality of the protocol when his death warrant is issued.

134 S. Ct. 894 (2014). Moreover, the United States Supreme Court recently upheld the constitutionality of the use of midazolam in executions under Oklahoma's three-drug lethal injection protocol. Glossip v. Gross, 135 S. Ct. 2726 (2015). We therefore affirm the trial court's denial of postconviction relief on this issue.

## HABEAS PETITION

In his petition for a writ of habeas corpus and supplement thereto, Smith claims that his counsel on direct appeal was ineffective by failing to: (1) appeal the denial of the severance of his counts; (2) challenge the standard jury instruction regarding the role of the jury in the penalty phase; (3) challenge the protocol for lethal injection; (4) challenge the manslaughter jury instruction; and (5) raise a claim of double jeopardy.

Claims of ineffective assistance of appellate counsel are properly presented in a petition for a writ of habeas corpus. Wickham v. State, 124 So. 3d 841, 863 (Fla. 2013). "The standard of review for ineffective appellate counsel claims mirrors the Strickland standard for ineffective assistance of trial counsel." Id. Specifically, to be entitled to habeas relief on the basis of ineffective assistance of appellate counsel, the defendant must establish:

> [First, that] the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, [that] the deficiency in performance compromised the

appellate process to such a degree as to undermine confidence in the correctness of the result.

Bradley v. State, 33 So. 3d 664, 684 (Fla. 2010) (quoting Pope v. Wainwright, 496 So. 2d 798, 800 (Fla. 1986)).

## I. Severance

Smith claims that his appellate counsel was ineffective in failing to claim that the trial court should have severed the counts of (1) conspiracy to murder Jackie Pope; (2) murder of Jackie Pope; and (3) murder of Kevin Smalls. Smith moved to sever these counts, claiming that the crimes were not committed in furtherance of the conspiracy. Because Smith did not pursue his motion to sever, his claim was not preserved for appeal. See Richardson, 437 So. 2d at 1094. "Appellate counsel is not ineffective for failing to raise issues not preserved for appeal." Groover v. Singletary, 656 So. 2d 424, 425 (Fla. 1995).

Smith was convicted of the first-degree murder of Pope and conspiracy to commit Pope's murder.[22] Even if preserved at trial, a claim on appeal that the trial court erred in failing to sever out the Pope counts would have been without any merit. The indictment covered crimes committed in connection with the John Doe enterprise based on its activity occurring from July 1994 through January 1999. Smith ordered the shooting of Pope, who was a John Doe "watchout." Smith, 7

---

22. Smith was not convicted of murdering Smalls in this case.

So. 3d at 484.  In March 1998, Pope's murder was carried out by John Doe "hitmen" because Pope had implicated another member of the organization in a shooting from a drug hole location.  Id. at 484-85.

We conclude that the counts at issue were "connected acts or transactions" to the RICO conspiracy.  See Fla. R. Crim. P. 3.150(a).  The counts are "considered in an episodic sense," and there was a " 'meaningful relationship' between or among the charges" as "the crimes in question [are] linked in some significant way."  Lugo v. State, 845 So. 2d 74, 93 (Fla. 2003) (quoting Garcia v. State, 568 So. 2d 896, 899 (Fla. 1990); Ellis v. State, 622 So. 2d 991, 999-1000 (Fla. 1993)).  Because the counts were linked, the trial court did not err in failing to grant the motion to sever.  See id.  Therefore, appellate counsel cannot be ineffective for failing to raise a nonmeritorious issue.  Accordingly, we deny this habeas claim.

## II.  Role of the Penalty Phase Jury

In this habeas petition, Smith also contends that his counsel on direct appeal was ineffective in failing to challenge the standard jury instruction regarding the role of the jury in the penalty phase.  Because Smith is entitled to a new penalty phase under Hurst, we do not address this claim.

## III.  Lethal Injection Protocol

Smith next asserts that his appellate counsel was ineffective in failing to challenge the lethal injection protocol. Smith fails to explain in his habeas petition how the protocol is unconstitutional. We conclude that Smith's claim lacks merit. See Glossip, 135 S. Ct. at 2726; Muhammad, 132 So. 3d at 197. Accordingly, we deny this habeas claim.

## IV. Manslaughter Jury Instruction

Smith asserts that his appellate counsel was also ineffective in failing to challenge the jury instruction on manslaughter. We decided Montgomery, however, in April 2010, which was several months after we affirmed Smith's direct appeal of his convictions and sentences. Appellate counsel cannot be deemed ineffective for failing to anticipate the change in law. See Nelms v. State, 596 So. 2d 441, 442 (Fla. 1992).

Smith also relies on the First District's decision in Montgomery v. State, 70 So. 3d 603, 604 (Fla. 1st DCA 2009), approved, 39 So. 3d 252 (Fla. 2010). Because trial counsel for Smith did not object to the manslaughter instruction, appellate counsel would have been required to demonstrate fundamental error. See Daniels v. State, 121 So. 3d 409, 417 (Fla. 2013). "Failing to instruct on an element of the crime over which the record reflects there was no dispute is not fundamental error." Id. at 417-18 (quoting Garzon v. State, 980 So. 2d 1038, 1042 (Fla. 2008)). Here, Smith has failed to allege that the intent element was in

- 45 -

dispute.  Because we find that this claim would have lacked merit had it been raised by appellate counsel, we conclude that Smith has failed to demonstrate that his appellate counsel was ineffective in this regard.  Accordingly, we deny this habeas claim.[23]

## V.  Double Jeopardy Claim

In a supplement to his habeas petition, Smith lastly claims that his appellate counsel was ineffective for failing to argue that his conviction for RICO conspiracy—along with his separately charged conspiracies—violated his double jeopardy rights.[24]  We find that this issue was insufficiently pled.  The defendant makes the conclusory allegation of double jeopardy and cites to the Second District Court of Appeal's opinion in Rios v. State, 19 So. 3d 1004 (Fla. 2d DCA 2009), to support his claim.  However, the argument fails to demonstrate how in this case the multiple conspiracy counts violated his rights.  Therefore, we deny habeas relief on this claim.

---

23.  To the extent that Smith contends that his appellate counsel was ineffective for failing to challenge the principal jury instruction on the conspiracy charges, we conclude that the claim is facially insufficient.  See Conahan v. State, 118 So. 3d 718, 734 (Fla. 2013) ("A habeas petition must plead specific facts that entitle the defendant to relief.  Conclusory allegations have repeatedly been held insufficient by this Court because they do not permit the court to examine the specific allegations against the record.").

24.  The defendant filed a motion to dismiss various counts of the indictment, but no ruling on the motion was sought in the trial court.

## CONCLUSION

In light of the foregoing, we affirm the trial court's denial of postconviction relief as to all claims except Smith's claim related to the constitutionality of Florida's death penalty scheme, and we deny habeas relief. We vacate Smith's death sentence as unconstitutional under <u>Hurst</u> and remand to the trial court for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
POLSTON, J., concurs in part and dissents in part with an opinion, in which CANADY, J., concurs.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

POLSTON, J., concurring in part and dissenting in part.

I concur with the majority's decision except its vacating of the death sentence pursuant to <u>Hurst</u>.

CANADY, J., concurs.

An Appeal from the Circuit Court in and for Miami-Dade County,
     Bertila Ana Soto, Judge - Case No. 132000CF040026A000XX
And an Original Proceeding – Habeas Corpus

Charles G. White of Charles G. White, P.A., Miami, Florida,

     for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Carol M. Dittmar, Senior Assistant Attorney General, Tampa, Florida,

for Appellee/Respondent